

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 2 3 2016

Madsen, C. J.

CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on JUN 23, 2016

Acting Clerk

**Supreme Court Clerk**

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | No. 91297-1 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| CHARLES VERDEL FARNSWORTH, JR., | ) | |
| | ) | Filed    JUN 2 3 2016 |
| Respondent. | ) | |
| | ) | |

OWENS, J. — Robbery and theft are closely related crimes. While both offenses involve stealing money or property, theft is elevated to robbery where the defendant uses force or threatened force to take the property. The main question in this case is whether certain conduct constituted a "threat of force," making the crime a robbery, not a theft. The legislature has broadly defined "threat" to specifically include "indirect[]" threats. RCW 9A.04.110(28). We have established in our case law that a threat need not be explicit to qualify—a threat can be implied by words or conduct. As we recently held, where an ordinary person could reasonably infer a threat of harm from the defendant's conduct, the defendant made an implied threat of force. *State v. Witherspoon*, 180 Wn.2d 875, 884, 329 P.3d 888 (2014). Today, we

are asked to decide whether, under the circumstances here, respondent Charles Farnsworth's handwritten note demanding money from a bank teller contained an implied threat of force.

Although the note did not convey an explicitly threatening message, we believe it was laden with inherent intimidation. When a person demands money at a bank, with no explanation or indication of lawful entitlement to money, it can imply a threat of force because without such a threat, the teller would have no incentive to comply. An ordinary bank teller could reasonably infer an implied threat of harm under these circumstances. Because of this implicit threat, banks have security guards and distinctive policies in place to prevent harm flowing from precisely these types of encounters. As Farnsworth's partner in crime explained, they were well aware that banks generally instructed their employees to react to such notes as if they contained an explicit threat; in fact, the pair relied on that knowledge and fear to commit this crime. In this context, we hold that there is sufficient evidence that the pair's conduct implied a threat of harm.

Additionally, Farnsworth asks us to find that cumulative trial court errors deprived him of a fair trial. We find that no errors accumulated to deprive Farnsworth of a fair trial. Consequently, we affirm Farnsworth's conviction for first degree robbery.

FACTS

On October 15, 2009, Farnsworth and James McFarland were suffering heroin withdrawals and had no money to purchase more. The pair made a plan to "rob" a bank. 13 Report of Proceedings (RP) at 1208. The plan was for McFarland to wait outside in the car while Farnsworth entered a bank wearing a wig and sunglasses as a disguise, and retrieve money. Farnsworth would present the note to the teller, which read, "No die [sic] packs, no tracking devices, put the money in the bag." Clerk's Papers (CP) at 34.

Farnsworth was "hem and hawing" while driving around, and McFarland grew increasingly frustrated with him, until he finally reached his breaking point. 13 RP at 1233. He grabbed the wig and note from Farnsworth's hands and entered the bank to carry out their plan. While Farnsworth waited outside in the car, McFarland approached a teller's counter, leaned through her window, and handed her the note. The teller, Sarah Van Zuyt, testified that she instantly knew she was being robbed when she read the note. She said she was "scared" and "in shock." 9 RP at 484. Ms. Van Zuyt complied with the demand "[b]ecause I didn't want anybody else to get harmed, and I didn't know what he was capable of doing." *Id.* at 486. She handed him about $300 in small bills, and McFarland left. Farnsworth and McFarland drove away, but they were pulled over and arrested a few blocks from the bank.

Both Farnsworth and McFarland were charged with first degree robbery pursuant to RCW 9A.56.200(1)(b) (robbery committed in a financial institution). Farnsworth faced the possibility of a life sentence under the Persistent Offender Accountability Act (POAA) of the Sentencing Reform Act of 1981 if convicted of this robbery, as he was previously convicted of a 2004 robbery and a 1984 vehicular homicide in California. Ch. 9.94A RCW. The POAA requires a life sentence when a repeat offender commits a third felony that is classified as a "most serious offense" (often referred to as a "third strike"). RCW 9.94A.570, .030(33), (38).

Likewise, McFarland faced a life sentence under the POAA, as he also had prior convictions of crimes classified as most serious offenses. He agreed to a plea bargain for an 8- to 10-year sentence instead of a life sentence, whereby McFarland would testify against Farnsworth in Farnsworth's jury trial for robbery. McFarland agreed to testify against Farnsworth after Farnsworth acted rudely toward McFarland while staying at Western State Hospital following arrest. 15 RP at 1430-31.

The jury was instructed on both first degree theft and first degree robbery; it unanimously convicted Farnsworth of first degree robbery, and, per the jury instructions, it did not consider the lesser-included crime of first degree theft. The trial court found that the conviction was his third strike under the POAA and sentenced him to life in prison without the possibility of release.

4

Farnsworth appealed, arguing that the evidence was insufficient to support robbery because (1) there was no threat of force and (2) he agreed to aid only a theft, not a robbery. Division Two of the Court of Appeals agreed, vacated his robbery conviction, and remanded to the trial court for sentencing on first degree theft. *State v. Farnsworth*, 184 Wn. App. 305, 314, 348 P.3d 759 (2014) (published in part). Farnsworth also argued that he was deprived of a fair trial under the cumulative error doctrine, raising six claimed errors. In the unpublished portion of its opinion, the Court of Appeals found only one suspect error, which it deemed harmless. *State v. Farnsworth*, No. 43167-0-II, slip op. (unpublished portion) at 14, 19 (Wash. Ct. App. Oct. 28, 2014). Although raised by Farnsworth, the Court of Appeals did not reach the issue of whether his earlier out-of-state conviction counted as a strike for purposes of the POAA because once his robbery conviction was vacated, the POAA was not implicated. *Id.* at 20.

The State petitioned this court for review, arguing that the Court of Appeals erred in finding insufficient evidence of a threat and of Farnsworth's accomplice liability. Farnsworth cross petitioned, again raising five of his claimed trial court errors and claiming his California conviction should not count as a strike for purposes of the POAA. We granted discretionary review of both the petition and cross petition. *State v. Farnsworth*, 183 Wn.2d 1001, 349 P.3d 856 (2015).

## ISSUES

1.      Was there sufficient evidence of a threat of force under these circumstances?

2.      Does the evidence show that Farnsworth had the requisite knowledge to be liable as an accomplice to robbery?

3.      Do Farnsworth's claimed trial court errors warrant reversal of his conviction?

4.      Does Farnsworth's out-of-state conviction compare to a strike for purposes of sentencing under the POAA?

## ANALYSIS

*1. Sufficient Evidence Supports an Implied Threat of Force under These Circumstances*

We are first asked to decide whether there was sufficient evidence of a threat of force during the crime. Specifically, the State asks us to reverse the Court of Appeals' finding that the use of the demand note here was insufficient to show any implicit or explicit threat of force. For the reasons explained below, we hold that under these circumstances—including the use of a demand note with no claim of legal entitlement to the money, the note's reference to dye packs, and the defendants' awareness that banking personnel would treat the note as a threat—there was sufficient evidence of an implied threat of force.

In a challenge to the sufficiency of the evidence, we must examine the record to determine whether any rational finder of fact could have found that the State proved each element beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). When a defendant challenges the sufficiency of the evidence, he or she admits the truth of all of the State's evidence. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). In such cases, appellate courts view the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor. *Id.* Circumstantial and direct evidence are to be considered equally reliable. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

At issue in this case is whether there was sufficient evidence of a threat of force during the crime. That is because the distinguishing element between robbery and theft is the use or threatened use of force. Robbery is committed when a person unlawfully takes the property of another "by the use or threatened use of immediate force, violence, or fear of injury to that person . . . ." RCW 9A.56.190. Theft, on the other hand, does not require any use of force. It is simply the wrongful taking of the property of another with intent to deprive him or her of such property. RCW 9A.56.020(1)(a).

Washington's criminal code defines "threat" as "to communicate, directly *or indirectly* the intent" to take a certain action. RCW 9A.04.110(28) (emphasis added). In many robberies, the threat of force is explicit. For instance, a robber might directly

7

communicate to a teller, "Hand over the money, or I will shoot you." Other times, the threat is clearly implied by conduct, such as pointing a gun at a bank teller and simply stating, "Give me the money." At issue in this case is whether, under the circumstances, the demand note given to the teller contained an indirect communication of implied threat of force.

We recently considered an implied threat in *Witherspoon* and articulated an objective standard to determine if the defendant used intimidation to take property: we ask if "an ordinary person in the victim's position could reasonably infer a threat of bodily harm from the defendant's acts." 180 Wn.2d at 884. There, the victim returned home to find an unknown car in her driveway and Witherspoon at the side of her home. *Id.* at 881. His left hand was behind his back. *Id.* The victim asked what he had behind his back and he replied that he had a pistol. *Id.* He then drove away. *Id.* Applying the objective standard above to these facts, this court found that a rational jury could infer that Witherspoon made an implied threat of force when he told her he had a pistol, despite the fact that he did not brandish a weapon. *Id.* at 885.

Unlike in *Witherspoon*, Farnsworth and McFarland did not state that they had a weapon. But some lower Washington courts have found that a demand note presented to a bank contains an implied threat based on the social and historical context of bank robberies. For instance, the Court of Appeals affirmed a trial court's ruling that a person demanding money from a teller communicated an implied threat because it

was "objectively reasonable" for a bank teller to fear harm in the circumstances, even though no explicit threat was made. *State v. Collinsworth*, 90 Wn. App. 546, 551, 966 P.2d 905 (1997). Division One explained, "No matter how calmly expressed, an unequivocal demand for the immediate surrender of the bank's money, unsupported by even the pretext of any lawful entitlement to the funds, is fraught with the implicit threat to use force." *Id.* at 553.

Division Two also found an implicit threat when a person handed a bank teller demand notes that contained statements such as "'This is a robbery,'" "'Put $3,000 in envelopes,'" and "'I will be watching you.'" *State v. Shcherenkov*, 146 Wn. App. 619, 622-23, 191 P.3d 99 (2008). Twice the defendant kept his hand in his pocket, but he never brandished a weapon or even spoke to the teller. *Id.* The bank tellers said they felt threatened and that they complied to avoid harm to others. *Id.* Division Two found that a rational jury could reasonably interpret an implied threat from his hand in his pocket and the text of the notes. *Id.* at 629.

We find the reasoning of these courts to be persuasive. Under *Witherspoon*'s objective test, the facts here support a finding that a reasonable person in the teller's position could reasonably infer a threat of bodily harm. Just as Witherspoon knew that if he told the victim he had a gun she would let him leave with her belongings, Farnsworth and McFarland knew that a bank teller would comply with whatever they wrote in the note if they conveyed a threat. McFarland testified, "[W]henever you're

9

robbing a bank, bank tellers are supposed to do exactly what you told them. Because they want to get somebody out of there. They figure the danger or potential danger to the place." 14 RP at 1254. They knew if the note conveyed a serious demand, it would imply a threat of force that would compel compliance. The dissenting judge on the Court of Appeals reasoned, "Indeed, without the implicit threat to use force, it is difficult to imagine why the teller would comply with the note's demand for money." *Farnsworth*, 184 Wn. App. at 316-17 (Worswick, J., dissenting in part).

In fact, the teller did feel threatened. She said she "knew [she] was getting robbed" instantly upon reading the note and complied to avoid anyone getting hurt. 9 RP at 482, 486. An ordinary person in her position could likewise reasonably infer that McFarland threatened to use force, as McFarland made no attempt to feign lawful entitlement to the money and instead demonstrated an unlawful intent by ordering her not to include dye packs in the money.

The note read, "No die [sic] packs, no tracking devices, put the money in the bag." CP at 34. While this note does not imply McFarland had a weapon, his words conveyed a threat. As the Court of Appeals in *Collinsworth* explained, demanding that a teller not include dye packs with the money "underscor[ed] the seriousness of his intent." 90 Wn. App. at 553.

Additionally, the evidence shows that Farnsworth and McFarland planned to commit a "robbery." When their drug money ran out, McFarland testified that

10

"[Farnsworth's] talking about doing this robbery. And I said, well, I'll go with you on it. And we'd go in and I'd drive. He was supposed to do the robbery and I was supposed to drive." 13 RP at 1207. Although the Court of Appeals essentially dismissed the pair's use of the term "robbery," calling it a colloquialism "similar to people saying their house was robbed when they really meant it was burglarized," *Farnsworth*, 184 Wn. App. at 310 n.5, their use of the term was significant because they acknowledged the differences between the terms. In his testimony, McFarland's use of various terms was not accidental: he distinguished between robbery and "boosting," which he likened to "shoplifting" or stealing. 13 RP at 1205; 14 RP at 1277. McFarland's word choice illustrates his intent to commit a robbery in the bank, as opposed to the crime of theft.

Under these circumstances, the defendants' conduct conveyed an implied threat of force designed to compel a reasonable person in the teller's position to give McFarland money. Therefore, we find that there was sufficient evidence to demonstrate a threat of force.

Farnsworth contends that adopting this standard would create a strict liability crime and result in any demand for money inside a bank being automatically interpreted as a threat. This, he argues, would mean that any unlawful demand for money at a bank would constitute robbery. This concern is understandable but ultimately unfounded. In every such case, the circumstances will be unique and

11

context-dependent, causing courts to determine whether the evidence supports an objective finding of a threat under our *Witherspoon* standard. For instance, a demand that arises out of confusion or mistake might not constitute a threat. Context matters.

In contrast, a theft does not rise to the level of a robbery because it involves no use or threat of force to effectuate the same outcome: taking another person's property. For example, a theft would occur where an individual induced the bank teller to place money on the counter and then took it without having any entitlement to it. It would be a theft, not a robbery, because the hypothetical lacks even an implied threat of force. *See, e.g., United States v. Wagstaff*, 865 F.2d 626, 627, 629 (4th Cir. 1989) (finding insufficient evidence of robbery because the defendant did not take money "'by intimidation'" where he removed money from a cash drawer without communicating with bank personnel). However, as the *Collinsworth* court observed, where a person demands the bank's money, "unsupported by even the pretext of any lawful entitlement to the funds," the demand can contain an implicit threat of force. *Collinsworth*, 90 Wn. App. at 553; *see also United States v. Hopkins*, 703 F.2d 1102, 1103 (9th Cir. 1983) (finding sufficient evidence of "intimidation" for robbery when a man presented the teller a note stating it was a robbery and demanding money).

In summary, a threat need not be direct or explicit to support a robbery conviction. A demand note for money at a bank can carry with it an implied threat of harm if the teller does not comply. Here, because Farnsworth's and McFarland's

conduct could cause an ordinary person in the teller's position to reasonably infer a threat of force from their demand note, we find sufficient evidence of a threat of force.

### 2. Sufficient Evidence Supports Farnsworth's Liability as an Accomplice to First Degree Robbery

Farnsworth asks us to find that there was insufficient evidence to support his conviction based on accomplice liability. However, we disagree because, as we concluded above, the crime committed was a robbery and Farnsworth planned the crime exactly as it occurred.

A person may be liable for the acts of another if he or she is an accomplice to the act. RCW 9A.08.020(1), (2)(c). One is an "accomplice" of another if the person aids or agrees to aid the other in planning or committing the crime, with the knowledge that it will promote or facilitate the commission of such crime. RCW 9A.08.020(3)(a)(ii). The Court of Appeals found insufficient evidence that Farnsworth knowingly aided a robbery, and instead held that he agreed to aid only a theft. *Farnsworth*, 184 Wn. App. at 313-14. A person is construed to have adequate knowledge when he or she acts with knowledge that his or her conduct will promote the specific crime charged. *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000). Thus, the question is whether Farnsworth agreed to aid in the commission of a robbery, including the use or threatened use of force or violence.

Since we find that the crime committed contained an implied threat, we also find that Farnsworth had the requisite knowledge because he helped plan the crime

13

exactly as it was committed. There was no deviation from their plan other than which member of the pair would enter the bank and who would wait in the car to drive them away after (and, of course, the evidence supporting the threat of force was not contingent on which of the two of them actually entered the bank). Most importantly, Farnsworth wrote the note that McFarland used. In fact, McFarland did not even read the note until later; he simply trusted Farnsworth's "experience" to write a note that would compel the teller to hand over the money. 14 RP at 1253. Given our finding that under the circumstances, the note written by Farnsworth contained an implied threat, we find sufficient evidence that Farnsworth was an accomplice to the crime of robbery.

### 3. *Farnsworth Was Not Deprived of a Fair Trial Due to Cumulative Error*

Farnsworth argued on appeal that the cumulative effect of six errors deprived him of a fair trial. In the unpublished portion of its opinion, the Court of Appeals found only one suspect error, which it deemed harmless, and thus found that Farnsworth was not deprived of a fair trial under the cumulative error doctrine. Farnsworth now raises five claims of error to this court. We find that the trial court did not err, and even if it had, any such errors were harmless. Thus, he was not deprived of a fair trial.

We review evidentiary rulings for an abuse of discretion by the trial court. *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). An abuse of discretion

occurs where a trial court's decision is manifestly unreasonable or made for untenable reasons. *Id.*

### A. Excluding McFarland's Plea Agreement Was Not Error

Farnsworth claims that the trial court erred when it excluded McFarland's plea agreement, preventing Farnsworth from the opportunity to meaningfully cross-examine and impeach McFarland. Generally, evidence of a plea agreement under these circumstances would be properly admitted to allow the jury to be privy to any possible bias McFarland had in testifying against Farnsworth. *See Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) (defendants are entitled to expose the jury to facts from which they can weigh the witness' reliability). We find that because the jury was informed of the contents of the plea agreement, it learned of McFarland's possible bias and motive in testifying against him. Consequently, we find the trial court made a reasonable decision in excluding the actual plea agreement, which had the potential to confuse the jury without adding any relevant information.

At trial, McFarland testified that he pleaded guilty to first degree theft. Farnsworth sought to admit McFarland's guilty plea agreement, which would show that he pleaded guilty to both first degree theft and first degree robbery; the latter charge would be removed if he testified. McFarland testified as to his plea agreement with the State on both direct examination and cross-examination. He told the jury he was facing "this bank robbery, and the third strike I would have had to fought. . . .

You get a third strike, it's life [in prison] without [parole]." 14 RP at 1259. He told

the jury that in exchange for complying with the State by testifying against

Farnsworth, he would receive a shorter sentence. McFarland testified, "[T]hey

usually drop your charges down to a lower crime and you get a little lesser

sentence . . . ." *Id.* at 1348. On cross-examination, Farnsworth's counsel inquired

into the plea agreement and the benefit McFarland would receive for testifying: a

possible eight-year sentence instead of life imprisonment. Thus, the jury was well

informed of its contents through McFarland's own testimony.

The trial court heard argument from the parties about admitting the plea

agreement, and ultimately excluded the plea agreement as being confusing,

misleading, and irrelevant, under ER 401 and 403. 15 RP 1395-1400. In general,

only relevant evidence is admissible. ER 402. Evidence is relevant if it has any

tendency to make the existence of any consequential fact more probable or less

probable. ER 401. However, relevant evidence is inadmissible if the danger of unfair

prejudice, confusion of the issues, or misleading the jury substantially outweighs its

probative value. ER 403.

The colloquy between the trial court, prosecutor, and Farnsworth's counsel

shows that the document contained some extrinsic information that might have been

misleading, confusing, or irrelevant. *See* 15 RP 1395-1400. As discussed, the jury

heard McFarland testify about the contents of the plea agreement, thus learning about

the potential motive McFarland had to testify against Farnsworth. The plea agreement would have added no new information that the jury did not already know from McFarland's own testimony, and thus admitting it had the potential to confuse the jury. Consequently, we believe that the trial court properly excluded it and do not find it was error to do so.

Moreover, we do not have a copy of the plea agreement to review on this appeal. Generally, we cannot speculate upon facts that are not part of the record.[1] *State v. Blight*, 89 Wn.2d 38, 46, 569 P.2d 1129 (1977). Thus, our review consists only of the trial court's ruling and Farnsworth's briefing about the contents of the document. Farnsworth's description of the discrepancy between the plea agreement and McFarland's testimony does not warrant finding an error. The jury was well informed of the deal McFarland was receiving, and the jury could infer his motive to testify. Even if Farnsworth had presented the plea agreement to us and could show the trial court erred by excluding it, the error would have been harmless, as discussed in the next section.

---

[1] Furthermore, it is questionable whether counsel did enough to preserve this issue for appellate review. *See* RAP 2.5(a). Counsel would have been well advised to make a clearer objection on the record.

*Even If Excluding McFarland's Plea Agreement Had Been Error, It Would*
*Have Been Harmless Error*

Even if excluding the plea agreement had been error, it would not be a ground

for reversing Farnsworth's conviction unless the error prejudiced the defendant. *State*

*v. Grenning*, 169 Wn.2d 47, 57, 234 P.3d 169 (2010). Such an error is prejudicial

where, "'had the error not occurred, the outcome of the trial would have been

materially affected.'" *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)

(quoting *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)).[2] Applying

that rule, we have often held that an erroneous admission or exclusion of evidence

was harmless where the evidence merely provided additional evidence of something

already shown by overwhelming untainted evidence (such additional evidence is often

referred to as "'merely cumulative'"). *State v. Gonzalez Flores*, 164 Wn.2d 1, 19, 186

P.3d 1038 (2008) (quoting Dennis J. Sweeney, *An Analysis of Harmless Error in*

*Washington: A Principled Process*, 31 GONZ. L. REV. 277, 319 (1995)).

Here, the exclusion of McFarland's plea agreement did not materially affect the

outcome of the trial. As discussed above, the jury was well aware of the benefit

---

[2] The dissent contends that Farnsworth raised a constitutional error rather than an evidentiary error, and that thus the proper standard is whether the error is harmless beyond a reasonable doubt. Farnsworth's briefs are not clear on this issue, as they do not discuss either standard, but we need not decide this issue because this error was harmless under either standard. The plea agreement was probative of one thing: McFarland's potential motive in testifying against Farnsworth. As we have explained, the jury was made aware by McFarland that he would receive a lower sentence in exchange for testifying. Since they received the relevant information necessary to evaluate McFarland's credibility, the exclusion of the plea agreement was harmless beyond a reasonable doubt.

McFarland received by testifying against Farnsworth. It would be different if the plea agreement was excluded and the jury did not otherwise learn of the plea deal. Under those circumstances, the jury would have not learned of McFarland's potential bias and would have been unable to judge the veracity of McFarland's testimony. However, that is simply not the case here. McFarland's statements fully informed the jury of the deal he was to receive in exchange for his testimony against Farnsworth, and the plea agreement was merely cumulative of other evidence presented. From that, the jury already had the relevant information to evaluate McFarland's motive to testify. Therefore, we find that even if it had been error to exclude the plea agreement, the error would have been harmless.

### B. The Trial Court Did Not Err By Admitting Evidence of Farnsworth's Prior Acts

Farnsworth argues that the trial court erred by allowing the jury to hear information about his prior acts in two instances: (1) the prosecutor's opening statement, which discussed Farnsworth's two 2004 convictions for robbery while wearing a wig without eliciting evidence thereof during trial, and (2) testimony regarding Farnsworth's rude conduct toward McFarland at Western State Hospital. As discussed below, we find that neither ruling was in error.

#### a. State's Opening Statement

Before trial, the parties argued to the trial court about the admissibility of Farnsworth's prior robbery convictions. The trial court decided to allow the evidence

because the prior robberies went to prove Farnsworth's knowledge as to the planning of the present robbery, as he carried them out in a similar manner (by wearing a wig and sunglasses). 4 RP at 161. Accordingly, during her opening statement, the prosecutor commented on Farnsworth's prior robbery convictions committed while wearing a wig. However, she did not end up eliciting evidence thereof during trial. Farnsworth moved for a mistrial, which the trial court denied. 17 RP at 1675-77.

A prosecutor's opening statement may outline the anticipated evidence that counsel has a good faith belief will be produced at trial. *State v. Campbell*, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984). The defendant bears the burden of showing the prosecutor acted without good faith. *Id.* at 16.

Here, when the State mentioned the robberies in its opening statement, it intended to elicit evidence of the robberies, as evidenced by the arguments prior to trial about the admissibility thereof. Farnsworth does not claim the prosecutor acted in bad faith by noting his prior robbery convictions in its opening statement, nor does the record show bad faith. Instead, the record shows that the prosecution changed its strategy and opted to elicit such evidence in rebuttal. In response, the defense changed its strategy, and then the State decided not to elicit evidence regarding the prior robberies. Therefore, this claim of error fails because the State's opening merely outlined anticipated evidence that would be produced at trial, as allowed by our case law.

### b. *Farnsworth's Rude Conduct at Western State Hospital*

At trial, the judge allowed McFarland to testify regarding Farnsworth's rude conduct toward him when they were at a hospital together after the crime. Farnsworth claims that decision violated ER 404(b) because the evidence had no probative value and prejudiced the jury against him. Farnsworth is correct that ER 404(b) precludes evidence of conduct intended to show that the defendant acted in conformity therewith in the charged incident. However, such evidence may "be admissible for another purpose, such as proof of motive, plan, or identity." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007).

In this case, the State elicited testimony not to show that Farnsworth was dangerous or acting in conformity with his conduct, but rather to offer evidence of McFarland's motive to testify against him. On the stand, McFarland explained that he considered "taking the beef for [Farnsworth]," but after Farnsworth acted rudely toward him while they were at a hospital together,[3] McFarland decided to testify against him. 15 RP at 1431. Since the purpose of eliciting the testimony was to show McFarland's motive to testify against Farnsworth, it was not error to allow it under ER 404(b).

### C. *Allowing Detective's Testimony regarding Statements Made by Farnsworth Was Not Error*

---

[3] While at a hospital together after their arrest, McFarland testified that Farnsworth called him a "'fucking stool pigeon'" and also "flipped [McFarland] the bird," pulled his pants down and "grabbed his private parts and says, 'Suck on these you son of a bitch.'" 15 RP at 1430.

Prior to trial, Farnsworth was ordered to provide a sample of his handwriting. He refused. At trial, the detective who attempted to obtain the handwriting sample relayed statements Farnsworth made to him when refusing to provide the handwriting sample. Specifically, the detective testified about Farnsworth's anger and his reasons for not complying with the court order. Farnsworth did not object to this testimony at the time, but he now claims that this testimony violated his constitutional right to remain silent.

Normally, we do not review such errors raised for the first time on appeal, although RAP 2.5(a) allows an appellate court to review an error not raised at trial if it was a manifest error affecting a constitutional right. To show that an error was manifest, one must demonstrate that the claimed error had identifiable consequences to the outcome of the trial whereby the court must put itself in the trial court's shoes to determine if the trial court could have corrected the error, given what the trial court knew at that time. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015).

Here, Farnsworth claims the error affected his constitutional right to remain silent. Accepting that, we must look to see if the error was "manifest." We conclude that admitting the detective's testimony was not manifest error. McFarland's detailed testimony implicating Farnsworth had a much greater impact than the detective's testimony that Farnsworth was angry about providing a handwriting sample. Therefore, given what the trial court knew at the time, it would not reasonably

conclude that admitting the detective's testimony would have identifiable consequences as to the outcome of Farnsworth's trial. Therefore, this is not a manifest error that would warrant our review despite Farnsworth's failure to raise this issue at trial.

### D. *Farnsworth's Presumption of Innocence Was Not Violated*

Farnsworth claims that his presumption of innocence was violated because he was marked with in-custody status as he sat in a "hard wooden chair," instead of the "soft, padded, leather chairs" counsel sat in. Answer to Pet. for Review and Cross-Pet. at 18. A criminal defendant's presumption of innocence is violated where the defendant lacks the appearance of "a free and innocent man." *State v. Finch*, 137 Wn.2d 792, 844, 975 P.2d 967 (1999) (the defendant's right to a fair trial was violated when he appeared before the jury in physical restraints). *Finch* pointed to prison garb and shackles or handcuffs as examples of physical markings of in-custody status. *Id.* at 844.

We find that the trial court did not err by allowing Farnsworth to sit in the wooden chair because a wooden chair does not carry the same association as do the physical restraints that this court is typically concerned with. *See, e.g., State v. Clark*, 143 Wn.2d 731, 774, 24 P.3d 1006 (2001) (considering whether defendant's shackling upon entering the jury auditorium was unconstitutional); *State v. Jennings*, 111 Wn. App. 54, 61, 44 P.3d 1 (2002) (considering whether a stun belt restraining defendant

was unconstitutional shackling). Thus, we find that Farnsworth's presumption of innocence was not violated and the trial court was not in error.

### E. The Cumulative Error Doctrine Does Not Warrant Reversal

The trial judge did not err by excluding McFarland's plea agreement, but even if it had been error, it was harmless because all of the relevant information from the plea agreement was already in front of the jury. As discussed above, Farnsworth's other claims were also not error. Therefore, there can be no accumulation of error that would warrant reversal under the cumulative error doctrine. *See State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006) (holding that the doctrine is inapplicable when "the errors are few and have little or no effect on the outcome of the trial").

### 4. The Issue of Comparability Is Remanded to the Court of Appeals

Finally, Farnsworth asks us to find that his prior out-of-state conviction is not legally comparable to a strike in Washington for purposes of sentencing under the POAA. The Court of Appeals did not reach this issue because it reversed his robbery conviction on other grounds. Having affirmed his conviction, we now remand this comparability issue to the Court of Appeals to consider on its merits.

### CONCLUSION

We hold that the evidence in this case was sufficient to establish an implied threat of force. In the banking context, a demand note for money under these circumstances objectively conveys an implied threat of force or violence, even though

24

no explicit threat was made. None of Farnsworth's other claims are meritorious, and thus we affirm his conviction. We remand the issue of the comparability of Farnsworth's earlier out-of-state conviction to the Court of Appeals to decide on its merits.

WE CONCUR:

*State v. Farnsworth (Charles V.)*

No. 91297-1

MADSEN, C.J. (concurring)—I agree with the lead opinion that there was sufficient evidence to find an implied threat of force and to support Charles Farnsworth's conviction based on accomplice liability. I write separately because I agree with the dissent's conclusion that the plea agreement should have been admitted into evidence and failure to do so amounted to constitutional error. However, because I would hold that the error was harmless beyond a reasonable doubt, I concur in the lead opinion.

Madsen, C.J.

No. 91297-1

GORDON McCLOUD, J. (dissenting in part)—I agree with the lead opinion

that the evidence was sufficient to convict Charles Farnsworth of first degree

robbery. But I disagree with its conclusion that the trial court properly excluded

key state witness James McFarland's written plea agreement, leaving the jury with

McFarland's slanted characterization of its details instead. With a cooperating

codefendant witness's plea agreement, the devil is in the details: they establish the

extent of the benefit that the witness stands to gain, what will trigger the benefit,

and why the witness might testify falsely to gain that benefit. Excluding the plea

agreement with all its details therefore violated Farnsworth's right to confront and

cross-examine witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. For

that reason, I respectfully dissent from the portion of the lead opinion rejecting that

claim.

ANALYSIS

I.      THE      TRIAL      COURT      COMPLETELY      EXCLUDED
        MCFARLAND'S      ACTUAL      PLEA      AGREEMENT      BUT
        ADMITTED      HIS      SLANTED      CHARACTERIZATION      OF      IT
        INSTEAD

McFarland was a key witness for the State. His testified for three days; no other witness testified for anywhere near that amount of time. He was the one who entered the bank to rob it; Farnsworth did not. He was the one who was caught on camera; Farnsworth was not. He was the one who requested the money from the teller; Farnsworth did not. 13 Verbatim Report of Proceedings (RP) at 1233, 1256-58. And, critically, he was the one who testified that Farnsworth had plotted with him to rob that bank; Farnsworth did not. *E.g.*, 14 RP at 1259.

While there was independent evidence corroborating the fact that McFarland entered the bank, wore a disguise, handed the demand note to the teller, got $333, and then left, there was no evidence corroborating McFarland's claims about what he and Farnsworth agreed about or disagreed about in the truck right before McFarland entered the bank. Specifically, there was no evidence to corroborate McFarland's trial claim that Farnsworth manipulated McFarland into entering the bank—as opposed to McFarland's earlier statements that Farnsworth instead completely "backed out" of the robbery before it ever happened.

That made McFarland's credibility critical for the State and attacking McFarland's credibility critical for the defense.

The State realized this; it preemptively moved to exclude McFarland's plea agreement so that the defense could not cross-examine McFarland about its details. The deputy prosecutor argued that the written plea agreement was entirely inadmissible despite its impeachment value: "I do not know the basis nor how he would be able to give an entire plea form to the jury." 15 RP at 1395.

Defense counsel also realized this; so he opposed the State's motion to exclude McFarland's guilty plea. He argued that the guilty plea exposed inaccuracies in McFarland's testimony and thus allowed Farnsworth to challenge McFarland's credibility. Specifically, he explained that when McFarland testified in the State's case in chief, he left the impression that he had *already* gained the main benefit of his plea bargain even before he testified at trial by claiming that under the plea agreement, he had pleaded guilty to only theft, not first degree robbery; he testified, "I didn't enter no guilty plea to first degree robbery and first degree theft, I don't think. It was just supposed to be first degree theft, from what I understand." 14 RP at 1347.[1] Defense counsel explained that the real plea

---

[1] McFarland claimed that he had already avoided the robbery with its third-strike consequence: "I was facing -- I was facing this bank robbery, and the third strike I would have had to fought." 14 RP at 1259.

3

agreement could expose that misstatement: "This document [the plea agreement] does not say that he's looking at 8 to 10 years," as McFarland claimed; instead, it indicates he is facing life without parole because it shows a plea to first degree robbery. 15 RP at 1399. Defense counsel also explained that McFarland "did not articulate, at least not such that I understood, that he understood that the count was going to be vacated. I believe he thought that it had already perhaps had been." *Id.* at 1400.

Defense counsel was correct about these factual inaccuracies in McFarland's testimony. Indeed, the lead opinion acknowledges that McFarland's testimony created the misimpression that he had already gained the benefit of his plea bargain. Lead opinion at 15. It was a misimpression because in reality, McFarland had actually pleaded guilty to both first degree theft *and* first degree robbery before he testified. His only hope of escaping the life-without-parole consequence of that first degree robbery, third-strike plea was for the State to move to dismiss the robbery *after* it heard McFarland's testimony against Farnsworth. The State *agreed* that that was the true meaning of the plea agreement and that McFarland's testimony to the contrary was incorrect; the prosecutor told the trial court: "Well, here is where the confusion is going to come in. Because he is a three-striker, I can't amend the document. I can't amend his charges up front because then,

4

obviously, the benefit of the bargain has been given before any performance." 15 RP at 1396. The prosecutor even read the language of that specific portion of the plea agreement out loud for the judge to hear. *Id.* at 1397.[2]

So the prosecutor knew that in reality, McFarland had already pleaded guilty to both theft and first degree robbery and that he had no hope of avoiding its third strike, life without parole consequence unless the State moved to dismiss after McFarland testified. The defense also knew that. So did the judge. But the trial court ruled that the jury couldn't hear that.

Instead, the jury heard only McFarland's characterization of the benefit he expected to receive from testifying, and that it was not that much.[3] According to McFarland, he did not plead guilty to the most serious charge and he had already received the benefit of his bargain.

---

[2] According to the prosecutor, "On Page 4 of 6 under 'Prosecutor's obligations' it indicates that 'If Mr. McFarland completely fulfills all his obligations as listed above, the state will move the court to vacate his conviction to Count I, Robbery in the First Degree; Count II, Theft in the First Degree shall remain and the defendant will be sentenced as to that count.'" 15 RP at 1397.

[3] McFarland's testimony also left the impression that he accurately understood and related what his plea agreement contained. But he did not. As Farnsworth's counsel explained, "And he's indicated that he doesn't know what the standard range sentence for Theft I is, and it's contained in this [plea agreement]. And he's initialed various parts of this [plea agreement]. He signed at the very end of it." *Id.* at 1398.

II.   EXCLUDING   THE   ACTUAL   PLEA   AGREEMENT   AND
LEAVING   THE   JURY   WITH   ONLY   MCFARLAND'S
MISLEADING   CHARACTERIZATION   OF   IT   VIOLATED   THE
RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES

The trial court excluded the actual plea agreement as irrelevant because

McFarland had already admitted to some *but not all* of the agreement's terms. *Id.*

at 1399 ("His motivation is 8 to 10 years versus life in prison; that's what he's

already testified to."). It also excluded the plea agreement as too confusing,

because McFarland's testimony about its terms differed from its actual terms. *Id.*

at 1399-1400 (sustaining prosecutor's objection based on "[ER] 403; confusing,

misleading. [ER] 401; irrelevant."). The lead opinion upholds both decisions.

Lead opinion at 15-17.

But the fact that the State's key witness claimed confusion (rather than

deceit) about the plea agreement's details is not a reason to exclude the real plea

agreement as too "confusing" for the jury under Rules of Evidence (ER) 403. And

the fact that the State's key witness admitted to some but not all of the incentives

the plea agreement provided does not make the details of the omitted incentives

"irrelevant" to the jury's assessment of witness credibility under ER 401.

Instead, those factors make details about the plea agreement's actual terms

more relevant and admissible—because the contradiction between the real plea

bargain terms and McFarland's slanted characterization of them could show that

6

the witness still had a motive to curry favor with the State, and that he was trying to hide that. The United States Supreme Court has clearly held that evidence of a plea bargain between the State and a testifying witness is admissible on cross-examination for just this reason. In *Delaware v. Van Arsdall*, for example, the Supreme Court reviewed a trial court's decision to deny cross-examination regarding the prosecutor's agreement to dismiss the witness's criminal charges. 475 U.S. 673, 676, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). The Court ruled that barring all such inquiry violated Van Arsdall's rights under the confrontation clause and that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Id.* at 680 (alteration in original) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)).[4]

---

[4] *Accord Olden v. Kentucky*, 488 U.S. 227, 231, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) ("'exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" (quoting *Davis*, 415 U.S. at 316-17 and citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959)).

Washington courts, of course, follow this authority. They also hold that the right to confront and cross-examine includes the right to expose a cooperating witness's plea agreement's details—its "specific reasons"—suggesting bias: "'The right of cross examination allows more than the asking of general questions concerning bias; it guarantees an opportunity to show *specific reasons* why a [codefendant] witness [testifying pursuant to a plea bargain] might be biased in a particular case.'" *State v. Portnoy*, 43 Wn. App. 455, 461, 718 P.2d 805 (1986) (some emphasis added) (first alteration in original) (quoting *State v. Brooks*, 25 Wn. App. 550, 551-52, 611 P.2d 1274 (1980)). "Such cross examination is the price the State must pay for admission of a codefendant's testimony to that plea. The jury needs to have full information about the witness's guilty plea in order to intelligently evaluate his testimony about the crimes allegedly committed with the defendant." *Id.*; *see Brooks*, 25 Wn. App. at 551-52 ("Great latitude must be allowed in cross-examining a key prosecution witness, particularly an accomplice who has turned State's witness, to show motive for his testimony. The right of cross-examination allows more than the asking of general questions concerning bias; *it guarantees an opportunity to show specific reasons why a witness might be biased in a particular case.* Here, the dropping of the deadly weapon allegation pursuant to the plea bargain agreement obviated a mandatory 5-year minimum

8

term for Macklin if he were sentenced to prison. The jury was entitled to consider that evidence in weighing Macklin's credibility." (emphasis added) (citations omitted)); *State v. Ahlfinger*, 50 Wn. App. 466, 475 n.4, 749 P.2d 190 (1988).[5]

The lead opinion certainly recognizes that the right to confront and cross-examine witnesses is a right of constitutional magnitude. Lead opinion at 15. The lead opinion rejects the confrontation clause claim, though, because it concludes—as did the State and the trial court—that McFarland's testimony was close enough to the truth that the real truth did not matter. 15 RP at 1399 (prosecutor argues, "Mr. McFarland's understanding is correct. He doesn't have the mechanics exactly correct. And that as he sits here today he still is charged as a three-striker. But his consideration in exchange for his cooperation is that I vacate it afterwards; so the substance is accurate"; court agrees); lead opinion at 17 ("The jury was well informed of the deal McFarland was receiving . . . .").

But it really was not that close. The jury did not get to hear that McFarland had already pleaded guilty to the three-strikes charge and that he therefore had a greater incentive to testify favorably for the State than he admitted. The jury did not get to hear that he was unable to describe things in the plea agreement accurately, despite having read and initialed those specific provisions. The jury

---

[5] *See also United States v. Schoneberg*, 396 F.3d 1036, 1041-44 (9th Cir. 2004) (summarizing reasons for this rule).

heard defense counsel's questions on these points, but McFarland never admitted the truth and the court prevented defense counsel from proving it up.

### III. THE STATE HAS NOT PROVED THAT THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT

The State made no argument that the confrontation clause error was harmless. The lead opinion addresses this issue anyway.

### A. The Constitutional Harmless Error Standard

To address the issue properly, we must acknowledge that violating the confrontation clause is an error of constitutional magnitude because it infringes on the defendant's Sixth Amendment and article I, section 22 rights to confront witnesses against him. *Van Arsdall*, 475 U.S. at 673; *Davis*, 415 U.S. at 318. It therefore requires reversal unless the State shows that it is harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 680; *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "The correct inquiry is whether, assuming that the damaging potential of the cross examination were fully realized," we can nevertheless say that the error was "harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. I therefore address the importance of McFarland's testimony in context and then the importance of the excluded evidence.

## B. McFarland Alone Provided the Critical Testimony That Farnsworth Planned and Executed the Robbery with Him

McFarland's testimony was important. It covered three days and spans three volumes of transcript. *See* 13-15 RP (Oct. 20, 24 and 25, 2011). He entered the bank—Farnsworth did not; he was caught on camera inside the bank—Farnsworth was not; he gave the note to the teller—Farnsworth did not; and he took the money and left the bank—Farnsworth did not.

To be sure, all of McFarland's testimony about his entering the bank, robbing the teller, and leaving with the money was corroborated by statements from other neutral witnesses and cameras. But there was a critical piece of evidence that McFarland alone provided: his testimony that Farnsworth helped plan, and then followed through by helping to execute, this specific heist. The State knew that that testimony from McFarland on this point was critical; its closing argument acknowledged that the jury could not convict Farnsworth unless they found he actively helped with this particular robbery.[6] The State therefore understood that testimony from McFarland on this point had to be believable. *E.g.*, 14 RP at 1314 (McFarland vehemently defends his truthfulness at trial). In short,

---

[6] "Sitting on your behind and not necessarily interfering or preventing it, not what we're talking about. We're talking about somebody who is willing to take some kind of role in allowing or making this crime happen." 17 RP at 1617.

McFarland's credibility was critical to the State because it formed the bases for its argument that Farnsworth was the brains of the operation.

It necessarily follows that attacking McFarland's credibility was critical for the defense because it formed the basis for their theory that at the last minute, McFarland went off on his own after Farnsworth backed out. *E.g.*, 17 RP at 1639 (defense counsel's closing argument that "[McFarland] needs to give the State what they want in his testimony"), 1640-50, 1653 (Defense's closing: "[T]here's only two significant issues in the case: Can you believe Mr. McFarland, and was [the bank teller] scared . . . .").

It is, of course, true that there was *sufficient* other evidence to connect Farnsworth with McFarland's robbery. That other evidence included Farnsworth's statement that McFarland was wearing the wig and sunglass disguise when he left the truck and headed for the bank. Clerk's Papers at 2-3; 12 RP at 1051. It included testimony from other witnesses that Farnsworth drove the truck that brought McFarland to the bank. 11 RP at 766-67, 810-11. It also included testimony that McFarland met that truck shortly after he left the bank and found Farnsworth still driving, and that officers then stopped the truck and found the wig, sunglasses, and cash from the bank inside. 10 RP at 616; 11 RP at 752; 13 RP at 1061. It further included testimony that Farnsworth denied knowing that

McFarland was heading inside to rob the bank, but when arrested afterward and told by the detectives that they were facing first degree robbery charges, he responded, "'We didn't have a gun.'" 15 RP at 1484. And, finally, it included expert testimony that "Charles Farnsworth wrote the questioned [demand] note and that James McFarland did not." 12 RP at 1028.

But the evidence that Farnsworth was the "brains" of the operation and that he followed through on any prior statements about wanting to rob this bank was thin and contradictory. Critically, there was McFarland's testimony that Farnsworth had actually "backed out" of any prior agreement to rob a bank and that McFarland at the last minute dashed off on his own without McFarland's help, assistance, or approval. *E.g.*, 13 RP at 1208 (McFarland testifies Farnsworth "backed out two or three times -- three times as a matter of fact."), 1219 (McFarland treats backing out as a sign of weakness, testifying that his "dope lady" accused him of backing out, and McFarland defends his honor by explaining, "[Farnsworth's] the one that backed out, not me."), 1231 (right before this robbery, "[Farnsworth] would just make up excuses for not going ahead and going through with this"), 1232 (same), 1233 ("[Farnsworth] was just -- you know, I wasn't really -- I just seen that he wasn't going to do it and I got mad. I got mad. I reached over and snatched the wig out of his hand and said, 'Give me that son of a bitch.' I said,

13

'You ain't going to do nothing.' I snatched the wig, put it on. I says, 'Wait right here. I'll be back in two minutes.'"), 1238 (same), 1239 ("It's been five to six hours and this kind of thing. [Farnsworth h]as been backing out and backing out and backing out. So I grabbed the wig out of his hand. I said, 'Give me that son of a bitch. I'm going up there.'"); 14 RP at 1306 (same); 15 RP at 1380 (same).

As the State itself summarized, "At trial, McFarland explained how the defendant obtained the wig that he wore into the bank and that it was the defendant who was actually supposed to do the robbery. *The defendant continually backed out*, and McFarland was quite drunk from trying to drown the effects of going without heroin, that he really couldn't drive. [15 RP at] 1380; [14 RP at] 1301. *Ultimately, in a moment of frustration, McFarland grabbed* the wig and glasses and went into the Credit Union. [14 RP at] 1306." Br. of Resp't at 7 (emphasis added); RP (Trial, Opening Statements) (Oct. 13, 2011) at 5-6 (State's opening statement: "It was Mr. Farnsworth that was supposed to do the robbery but he kept backing out.").

The State had to deal with that wrinkle in its case in closing, and it did so by arguing that Farnsworth was faking backing out and really using "manipulative behavior . . . for the purpose *that Mr. McFarland suggested*, which is that he just wanted to wear McFarland down to get him to take the bigger risk." 17 RP at 1622

14

(emphasis added). Thus, the critical issue for the jury was whether or not to believe McFarland's "suggestion" about Farnsworth's major role in planning and then manipulating McFarland into doing the robbery himself. If McFarland's testimony on these points were not believable, then probably all the State could have proved was rendering criminal assistance afterward. RCW 9A.76.050(3). That is not a third strike.

In context, McFarland's testimony and credibility were critical to Farnsworth's conviction of first degree robbery, which is a third strike offense.

### C. McFarland's Plea Agreement Would Have Enabled the Defense To Cast Doubt on McFarland's Claims of Honesty, Impartiality, and Lack of Bias

Given this context, the excluded evidence was very important. Exclusion allowed McFarland to avoid tough questions about whether he misperceived the plea agreement (which could have bolstered an argument that he also misperceived Farnsworth's supposed acquiescence in the robbery), misremembered the plea agreement (which could have bolstered an argument that he also misremembered Farnsworth's supposed role in the robbery), or lied about the agreement (which could have bolstered an argument that he lied about Farnsworth's role in the robbery). McFarland's hope for a future benefit based on his performance at

15

Farnsworth's trial certainly provided him with more incentive to curry favor with the State than a "done deal" would have.

To be sure, as the State argued, Farnsworth was able to show that McFarland "was a long-time heroin addict, an alcoholic, had failed rehabilitation, had made a routine of stealing to support himself, was homeless with no means of support, had contemplated stealing a car on the day of the robbery, and in fact stole some merchandise that day. He further demonstrated that the witness was very familiar with the Department of Corrections, had a high offender score, and spent a large portion of his adult life incarcerated. It's difficult to imagine being able to paint a more dreary or unfavorable image of witness than was allowed." Br. of Resp't at 12; *see also* 13 RP at 1200 (McFarland testifies he was so sick from withdrawal the day of the robbery, he was hallucinating). But evidence that McFarland was "dreary or unfavorable" is not the same as evidence that he had a strong incentive to slant his testimony to curry favor with the State.

## CONCLUSION

I agree with the lead opinion that the evidence of Farnsworth's involvement with McFarland in a prior plan to rob something was sufficient. But the evidence of Farnsworth's assistance with this particular robbery was not strong. Some testimony even made this particular robbery sound like it was McFarland's own

personal, individual moment of drunken frustration after Farnsworth had "backed out." McFarland's credibility about Farnsworth's planning and execution of this particular robbery was therefore critical.

Given that context, I cannot say that the constitutional error of excluding the plea agreement that could have impeached McFarland is harmless beyond a reasonable doubt. The reason is that cross-examination about that plea agreement's details could have revealed the extent of the benefit that the witness expected from testifying favorably to the State, what would trigger that benefit, and hence why the witness might testify falsely to gain that benefit. I therefore respectfully dissent in part.

Gordon McCloud, J.

González, J.

Stephens, J.

Fairhurst, J.