IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33644-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA DAVID FLEMING, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Joshua Fleming appeals his conviction for first degree assault,

primarily arguing that the evidence was insufficient to support his identification as the

assailant. His arguments largely go to the weight to be accorded the evidence. The

circumstantial evidence was sufficient to support the trial judge's conclusion that

Fleming committed the crime. We affirm.

FACTS

This case arises from a May 1, 2012, stabbing at a transient gathering spot[1] in

Spokane's Garland District. Eric Stensgar, a Native American, and a white male with

---

[1] The location was the west side of a house located on West Garland Avenue in Spokane between two business establishments. The view of the west side from the alley on the south side of the property was partially obscured by some old appliances and a tree against which three or four pieces of plywood were leaning, affording some privacy from the rear. Trees growing on the north side of the house obscure the view from Garland Avenue. Exs. 1, 49, 67-68, 96-97, 104.

short blonde hair, were observed by neighbors in the backyard of a house near the alley.

A short time later the other man ran down the alley and Stensgar was discovered on the

ground with 17 stab wounds to the head, neck, ear, and back. One of the wounds had

punctured his skull. He underwent surgery to address life-threatening injuries.

In addition to the clothing Stensgar was wearing, which was cut off him by

medical personnel at the scene, police found an Ecko letterman-style jacket with blood on

the sleeves. The jacket sleeves were inside out as if it had been hastily removed. The

jacket was found on the side yard of the house in the area described as the gathering spot.

Two beer bottles and a bottle of Mountain Dew, appearing to be the most recent additions

to the area due to the lack of weathering and a new looking beer container, also were

recovered from the scene. Fingerprints on two of the bottles and a plastic bag were

identified as belonging to the defendant.[2]

A first degree assault charge was filed May 21, 2012, and a detective

unsuccessfully attempted to talk to Fleming in the Kootenai County, Idaho, Jail.

Eventually, Mr. Fleming was returned to Washington from Idaho by use of the Interstate

Agreement on Detainers. While Fleming was enroute back to Washington, Mr. Stensgar

committed suicide. When authorities discovered that fact, they obtained a search warrant

---

[2] Although described as a "transient camp" by one witness, the west side yard was primarily littered with old building materials and carpet. There were a few bottles and broken glass, but no clothing or bedding, and there was no other indication that people actually were then staying at the scene. *See* Exhibit 114, attached as Appendix A.

2

to collect a DNA sample from Mr. Fleming in order to test the Ecko jacket. The warrant was executed and a DNA sample collected. The initial results of DNA testing on the neck of the jacket were inconclusive. Report of Proceedings (RP) at 157. The prosecutor dismissed the charges without prejudice and Mr. Fleming was returned to the custody of Idaho authorities.

Renewed efforts at testing the jacket led to the discovery of Mr. Fleming's DNA. He was considered a "major contributor" of the DNA found on the right sleeve of the jacket and on the two cuffs. Mr. Stensgar's blood was found on the jacket sleeves. RP at 157-158. The prosecutor refiled the charge of first degree assault while armed with a deadly weapon and Mr. Fleming once more was returned from Idaho. His counsel moved to suppress the results of the DNA swab, challenging the basis for the warrant. The court denied the motion.

Mr. Fleming waived his right to a jury trial and the matter proceeded to trial before the Honorable Harold Clarke III. The parties stipulated to the admission of police reports and a summary of witness testimony rather than call most of the listed witnesses to the stand. The parties also stipulated to the admission of more than 200 exhibits, primarily consisting of crime scene photographs. The prosecutor did present live testimony from a detective, a patrol officer, a paramedic, two neighbors, the fingerprint examiner, and the DNA analyst. One neighbor testified that he had never seen the blonde haired man at the scene before. RP at 80, 87. The defense rested without calling any witnesses.

3

The contested issue in closing argument was the identity of the assailant. Judge Clarke took the matter under advisement and returned two days later to render his judgment. After concluding that the other issues in the case, including the deadly weapon enhancement, were established beyond a reasonable doubt, Judge Clarke turned to the identity issue. RP at 282-290. He initially noted that the description given by the witnesses that the other man was a slim, young, white male fit the defendant. While it was "marginal circumstantial evidence," it did not exclude the defendant. RP at 290-291.

Judge Clarke also noted that the defendant's fingerprints had been found on one beer bottle, the Mountain Dew bottle, and the plastic bag wrapped around the "plaque." RP at 291. From these items, Judge Clarke concluded that the defendant had been present in the area where the stabbing occurred. He also noted that the items had been set down, not merely tossed on the ground, and "the presentation was of some recency." The items had not been there all winter and spring. RP at 292. Had the evidence stopped at that point, the judge would have found it insufficient. RP at 292.

The other piece of evidence that added to the mix was the jacket. RP at 292-293. It was found in the immediate vicinity of the assault and contained the victim's blood on the sleeves. Judge Clarke also agreed with the testimony that the jacket had been hastily shed by the assailant. RP at 293. Because the jacket only contained blood on the exterior sleeves (the part turned in) rather than the interior, it had not been on the ground at the

4

time of the stabbing. The jacket had Mr. Fleming's DNA on the inside of both cuffs and he was the "major contributor." RP at 293-294.

> What that tells me is that Mr. Fleming had that coat on at some point in time. And to me this directly ties Mr. Fleming not just to the scene, but to the attack itself; because, again, the coat was being worn at the time of the assault, at least that is what the evidence tells me, and that is what I will so find. And it is clear that at some point in time Mr. Fleming had that coat on.
>
> Now, if you combine that with the fact that Mr. Fleming's fingerprints were found, so we know he was physically there at some point, we find his -- it has been found, his DNA on the inside of that coat, we know at some time he was wearing that coat, and we know that coat was involved at some point in time in some way, shape or form.
>
> It clearly -- and I said this a moment ago -- but it clearly implies that whoever was wearing the coat committed the assault, and then decided to get rid of the coat because of the blood. That to me is patently clear.
>
> As counsel noted, it is a circumstantial case, and I appreciate that. As I said earlier, there are no eyewitness to the act. It's clear.
>
> But based on the totality of the circumstantial evidence, and particularly in the situation as I have described it with the coat, it appears to me that in fact Mr. Fleming did commit this act of assault, and I will find that beyond a reasonable doubt he did in fact commit the crime of first-degree assault against Eric Stensgar on May 1st of 2012.

RP at 294-295.

The defense subsequently brought a motion for a new trial on several grounds. The court denied the motion and ultimately sentenced Mr. Fleming as a persistent offender to life in prison without possibility of parole. Findings required by CrR 3.6 and CrR 6.1 were entered.

5

Mr. Fleming timely appealed to this court. A panel heard oral argument on the case.

## ANALYSIS

This appeal presents a challenge to the sufficiency of the evidence of identity to support the conviction and to the adequacy of the search warrant used to obtain Mr. Fleming's DNA sample. He also filed a pro se Statement of Additional Grounds (SAG) raising several issues. We address the two appeal issues in the order noted before considering some of the SAG contentions.

*Sufficiency of the Evidence*

The primary issue in this appeal, as it was at trial, involves the identity of the assailant. Mr. Fleming argues there was not enough evidence linking him to the crime. However, properly viewed, the evidence does support the bench verdict.

Long settled standards govern our review of this contention. "Following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-106, 330 P.3d 182 (2014) (*citing State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005)). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id.* at 106. In reviewing insufficiency claims, the appellant necessarily admits the truth of the State's evidence and all reasonable inferences drawn therefrom. *State v. Salinas*, 119 Wn.2d

192, 201, 829 P.2d 1068 (1992). Finally, this court must defer to the finder of fact in resolving conflicting evidence and credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

This approach is the specific application of the evidentiary sufficiency standard dictated by the Fourteenth Amendment. *Jackson v. Virginia*, 443 U.S. 307, 317-318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Specifically, *Jackson* stated the test for evidentiary sufficiency under the federal constitution to be "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Washington promptly adopted this standard in *State v. Green*, 94 Wn.2d 216, 221-222, 616 P.2d 628 (1980) (plurality); *Id.* at 235 (Utter, C.J., concurring). *Accord, State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016).

Under *Jackson*, the test is *could* the trier of fact find the element(s) proven. Whether the trial judge *should* have done so is not our concern. For that reason, most of the arguments Mr. Fleming raises—such as the agreement by both the fingerprint and DNA examiners that they could not tell when the defendant left those items behind—go to the weight to be given the testimony by the trier of fact. The trial judge having found those arguments wanting, this court is in no position to strike a different balance.

Judge Clarke nicely summed up the critical evidence of identity. A man fitting the general description of Mr. Fleming was seen with the victim shortly before the stabbing

7

and then fled the area immediately afterwards. It is quite reasonable to infer the person was the attacker. Recently deposited bottles, set upon the ground rather than discarded, contained the defendant's fingerprints. There were no bottles other than the six new-looking Coors Light in sight. The exterior sleeves of the jacket worn by the assailant had the victim's blood on it, as could be easily imagined from 17 stab wounds. The interior cuffs of both jacket sleeves contained significant amounts of the defendant's DNA, as did the right sleeve. It also is easy to imagine that someone repeatedly stabbing another person would be rubbing his skin against the cuff and sleeve of the jacket in the course of doing so.[3] The trial court understandably concluded that Mr. Fleming "was wearing the jacket when the crime was committed." Clerk's Papers (CP) at 371 (finding of fact 2.13). Substantial evidence supports that finding.

Judge Clarke rightly looked to the totality of the circumstances rather than consider each piece of identity evidence on its own. There was no evidence that Mr. Fleming had ever been to the crime scene[4] before, yet his DNA was predominant on the jacket used by the attacker, and in the areas where a person vigorously using his arm

---

[3] If someone else had committed the crime, it is very difficult to imagine how they could have used the jacket so vigorously without leaving their own DNA on the sleeve and cuffs, the very areas where the defendant was the "major contributor" of the DNA. The photographs of the scene also show no other clothing than that worn by Mr. Stengsar and his attacker.

[4] A neighbor, Mr. Miltimore, affirmatively stated that he had not seen the blond haired man at the location before. RP at 87.

No. 33644-1-III
*State v. Fleming*

would likely deposit DNA. His fingerprints were found on three different items (a beer bottle, the Mountain Dew bottle, and the plastic bags wrapping the plaque), two of which appeared to have been recently placed at the scene. He also fit the general physical description of the assailant. The multiple items at the crime scene bearing Mr. Fleming's identification showed "recency" as the trial court described it. RP at 292. Although the fingerprints and the DNA would themselves not indicate when they had been placed at the scene, other circumstances permitted the determination that it had happened on May 1, 2012. Since there was no indication Mr. Fleming had ever been at the scene in the past (and some evidence he had never been there), the presence of the multiple identifiers suggested "recency," as did the condition of those items. The beer and soft drink bottles looked fresh and had not been outside the entire spring. There was no suggestion that a large pile of bottles littered the scene or that anyone else had been using the area recently.[5] There simply was no evidence suggesting that the items containing Mr. Fleming's identifiers had been there before May 1, 2012.

Our dissenting colleague fails to allow the trial judge to draw reasonable inferences from the evidence. We have no hesitancy in saying that this case was sufficient to go to a jury and we are loathe to hold a trial judge sitting as trier of fact to a more stringent standard of review. The dissent renders irrational the trial judge's

_____

[5] Mr. Benefield believed no one was living at the house at the time of the assault. RP at 72.

9

determination that the defendant's fingerprints and DNA were left on the scene at the time the crime was committed merely because the experts could not say when the materials were left at the scene. We know of no rule that requires expert testimony before determining when bodily materials were left at the scene. It was permissible for the trial court to infer "recency," as it did, in the absence of any evidence that there was some opportunity for them to have been left behind on an earlier occasion.[6] The coat and the two bottles that bore Mr. Flemings DNA and fingerprints had been placed there recently according to the testimony and to the trial judge's factual finding. An un-weathered container for the Coors Light, as well as the accompanying six bottles, looked fresh to the observers. One of them was even unopened, a curious fact if this was truly a homeless encampment.[7] Similarly, the Ekco jacket, pictured in quite a few of the exhibits before this court, looks to be in excellent condition other than for blood smears marring its sleeves. It does not appear to have been left exposed to the elements.

The trial court expressly stated that the items recently deposited at the scene were all in close proximity to where the attack took place. RP at 291-294. Those were also the

---

[6] The dissent overstates our observation that there was no evidence the defendant had ever been at the scene before May 1, 2012, to conclude that we believe he had never been there. Simply put, the defense presented no evidence, nor did the State, that Mr. Fleming had ever been to the Garland Avenue location.

[7] The dissent opines at some length, although without any evidentiary support in this record, about the characteristics of homeless encampments, including communal clothing. In the same view, we will opine that unopened alcohol containers are unlikely to remain that way in a location used for communal drinking.

same items that contained Mr. Fleming's personal identifiers. The most reasonable inference to draw from that evidence was that they were left at the time of the attack.[8] There was no evidence to the contrary.

A rational trier of fact could conclude, as Judge Clarke did, that the items were deposited on May 1, 2012, and specifically that Mr. Fleming had worn the jacket on that date at the time he repeatedly stabbed Mr. Stensgar. Could the trial court have found that the fingerprints and DNA had been deposited earlier? Yes. However, the court did not. Instead, the court found those items were placed there on the day of the crime. The evidence permitted that determination. Accordingly, it was sufficient.

The evidence supported the bench verdict.

*Search Warrant*

Mr. Fleming also challenges the search warrant used to obtain his DNA, arguing that the affidavit failed to establish probable cause and that the warrant should not have issued until DNA was first recovered from the jacket. Because there was ample probable cause to issue the warrant and no policy reason supports limiting the magistrate's search warrant authority, we reject his contention.

---

[8] The absence of evidence that other clothing or old bottles were located at the scene of the attack furthers the trial court's reasoning on this point. There was no other clothing left behind, a key problem with the "transient camp theory" of communal clothing. Instead, all of the recent evidence pointed to involvement in the crime, and nothing older did.

Cheek swabs are searches and therefore implicate attendant state and federal constitutional protections. *State v. Garcia-Salgado*, 170 Wn.2d 176, 184, 240 P.3d 153 (2010). Consequently, warrantless cheek swabs are per se unreasonable under both constitutions. *Id.*

Probable cause to issue a warrant is established if the supporting affidavit sets forth "facts sufficient for a reasonable person to conclude the defendant probably is involved in criminal activity." *State v. Huft*, 106 Wn.2d 206, 209, 720 P.2d 838 (1986). The affidavit must be tested in a commonsense fashion rather than hypertechnically. *State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977). The existence of probable cause is a legal question which a reviewing court considers de novo. *State v. Chamberlin*, 161 Wn.2d 30, 40, 162 P.3d 389 (2007). However, "[g]reat deference is accorded the issuing magistrate's determination of probable cause." *State v. Cord*, 103 Wn.2d 361, 366, 693 P.2d 81 (1985). Even if the propriety of issuing the warrant were debatable, the deference due the magistrate's decision would tip the balance in favor of upholding the warrant. *State v. Jackson*, 102 Wn.2d 432, 446, 688 P.2d 136 (1984). In light of the deference owed the magistrate's decision, the proper question on review, as with the previous issue, is whether the magistrate *could* draw the connection, not whether she *should* do so.

The search warrant affidavit contained the following facts that demonstrate probable cause existed to obtain Mr. Fleming's DNA: (1) Mr. Stensgar identified Mr. Fleming via photo lineup as the last person he was with prior to the assault, (2) Mr.

12

Stensgar identified the Ecko jacket as having been worn by Mr. Fleming just before the assault, (3) a fingerprint belonging to Mr. Fleming was found at the crime scene, (4) Mr. Fleming matched the age and physical description of the suspect given by Mr. Stensgar, and (5) a bloodstained Ecko jacket was found at the scene. CP at 107-109. The jacket had blood on the sleeve indicating it was worn by Mr. Stensgar's assailant. Mr. Stensgar identified Mr. Fleming as the last person he was with and indicated the Ecko jacket was worn by Mr. Fleming just before the assault. Even though Mr. Stensgar has passed away, probable cause may be based on hearsay. *See State v. Chenoweth*, 160 Wn.2d 454, 475-476, 158 P.3d 595 (2007). Given Mr. Stensgar's statements, a magistrate could find a clear indication Mr. Fleming's DNA would also be on the Ecko jacket he had been wearing. Probable cause existed to obtain the DNA sample.

Mr. Fleming next argues that the warrant should not have issued until DNA was first recovered from the jacket, citing to some federal trial court decisions. Washington has not yet adopted this policy and Mr. Fleming cites no compelling reason why we should do so. This approach also appears to conflict with that used in *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). In *Gregory* the court found that the rape kits used on the victims provided a source for DNA comparison. There was no indication that testing had already been done to identify the presence of male DNA for comparison.

13

Fleming's proposed rule engrafts an unnecessary restriction on the issuing magistrate's authority that is not required by the constitution or our court rules. A search warrant may issue to seize "evidence of a crime" if there is probable cause to do so. CrR 2.3(b)(1), (c). There was reason to believe that Mr. Fleming had used the jacket in the course of assaulting Mr. Stensgar. Accordingly, it was proper to issue a warrant to test the jacket. Under Mr. Fleming's proposal, law enforcement would be required to first obtain a warrant to find DNA on a jacket (or other evidence) before then seeking a second warrant to collect DNA from the person they had reason to believe may have left it in the first place. There is no reason to compel sequential search warrants and sequential testing. This process would waste time and scare resources.

There was probable cause to issue the search warrant to obtain Mr. Fleming's DNA. The trial court did not err.

*Statement of Additional Grounds*

The SAG raises claims of ineffective assistance of counsel, prosecutorial misconduct, and alleged due process violations related to obtaining the DNA sample. The latter argument overlaps counsel's challenge to the search warrant and we will not further address it other than to note a defendant has no right to counsel to contest the issuance or service of a search warrant. *State v. Kalakosky*, 121 Wn.2d 525, 533, 852 P.2d 1064 (1993). *See* RAP 10.10(a) (SAG should address issues not adequately raised by counsel). We summarily address portions of the other claims.

14

Counsel renders ineffective assistance of counsel when he fails to perform to the standards of the profession and prejudices his client's case. *Strickland v. Washington*, 466 U.S. 668, 690-692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-335, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for finding error. *Strickland*, 466 U.S. at 689-691. A strong presumption of effectiveness exists. *Id.*

The ineffective assistance claim is without merit. Much of the argument is devoted to contentions that defense counsel could have better cross-examined the State's witnesses. "However, even a lame cross-examination will seldom, if ever, amount to a Sixth Amendment violation." *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 489, 965 P.2d 593 (1998). In large part this observation rests on the fact that one can only speculate about what evidence might have otherwise been developed. Similarly, the complaint that counsel should have pursued a DNA expert does not establish that counsel erred since there is no indication that an expert would have any useful information, let alone that it would have undermined confidence in the bench verdict.

Similarly, the prosecutorial misconduct argument is without merit. Without deciding that there was error by the prosecutor, the two instances mentioned in the SAG clearly were capable of being corrected by a timely objection and curative instruction. Moreover, since this was a bench trial, we presume that the trial judge followed the law

15

No. 33644-1-III
*State v. Fleming*

and did not consider the evidence for improper purposes. *State v. Miles*, 77 Wn.2d 593,

601, 464 P.2d 723 (1970).

The SAG does not present any meritorious arguments. Accordingly, we affirm the

judgment. In light of the persistent offender sentence, we exercise our discretion and

decline to award costs to the State.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Korsmo, J.

I CONCUR:

_____
Lawrence-Berrey, A.C.J.

16

## APPENDIX A



No. 33644-1-III

PENNELL, J. (dissenting) —To prove guilt beyond a reasonable doubt, the State must do more than show the defendant had been present at the scene of a crime. Instead, the State is obliged to set forth facts indicative of the defendant's actual involvement. Although circumstantial evidence can be sufficient to satisfy this burden, it is sometimes too equivocal to allow a reasonable inference of guilt. This is one such case.

The evidence taken in the light most favorable to the State established the following:

- Eric Stensgar was assaulted with a knife, resulting in approximately 12 stab wounds to his back and 5 wounds to his neck, ear, and forehead.

- A white male with dark blonde hair was seen with Mr. Stensgar just prior to the assault.

- Fingerprint evidence recovered from various bottles revealed that Joshua Fleming had been at the scene of the crime some time prior to the assault.

- The condition of the Ecko jacket, bearing Mr. Stensgar's blood on sleeves that had been turned partially inside out, indicated the perpetrator of the assault had been wearing the jacket at the time of the assault and then doffed the jacket prior to fleeing the scene.

- The presence of Mr. Fleming's DNA[1] on the cuffs of the Ecko jacket permitted the inference that Mr. Fleming had worn the jacket at some point prior to the assault.

---

[1] Deoxyribonnucleic acid.

The State's evidence was not sufficient to lend itself to other factual findings relied on in the majority opinion. For example, the majority says the man observed with Mr. Stensgar just prior to the assault fit Mr. Fleming's "general description." Majority at 7. This is a stretch. The man in question was described as white with "sandy blond" or "reddish-blond" hair that came down to around the ears. 1 Verbatim Report of Proceedings (VRP) (Mar. 16, 2015) at 80. There was no information as to age, weight, or facial hair. In comparison, Mr. Fleming was described as clean shaven, five-foot nine, 170 pounds, with hair about a half inch in length. No record was made of Mr. Fleming's race or hair color. Even assuming the trial court observed he was white and had blondish hair, these similarities do not lend themselves to the conclusion that Mr. Fleming met the suspect's general description.

The majority also makes the remarkable inference that Mr. Fleming had never been to the scene prior to the date of the assault. Majority at 8. There was no evidence in this regard. Two lay witnesses testified at trial. Both were familiar with the neighborhood. Neither witness was asked if he recognized Mr. Fleming, or if Mr. Fleming had been observed in the neighborhood. One of the lay witnesses stated he had never before seen the suspect individual he observed with Mr. Stensgar just prior to the assault. But the witness did not state this individual was Mr. Fleming. One can only draw the conclusion that the witness had never seen Mr. Fleming in the neighborhood prior to the assault if one first assumes that Mr. Fleming was the suspect. Such circular

2

reasoning has no place in a sufficiency analysis.

The majority places great weight on the fact that Mr. Fleming's fingerprints were discovered on two bottles found in the area. But the majority fails to mention that the most important bottle located at the scene was a clear-colored broken schnapps bottle. One of the two lay witnesses observed Mr. Stensgar and the suspect individual drinking from a similar looking bottle just prior to the assault. There was no testimony as to beer drinking. The schnapps bottle was tested for fingerprints, but none were recovered. The fact that Mr. Fleming's fingerprints were found on bottles associated with the area, but not the bottle associated with the assailant, suggests he may have resided in the area, but it says nothing about his identity as Mr. Stensgar's attacker.

The majority understandably focuses on the Ecko jacket. As previously noted, it is fair to infer that Mr. Stensgar's assailant wore the jacket during the assault. However, the majority's claim that it would have been difficult to doff the Ecko jacket without leaving behind DNA is not supported by the record. There was no testimony to this effect. To the contrary, there was some testimony that the cuffs of the Ecko jacket may have been turned up at the time of the assault. In any event, the State's DNA expert emphasized that she could not draw any conclusions about when the jacket was worn based on the presence of DNA. According to the expert, "all individuals, many shed or slough their skin in different ways and at different levels. So it can't really specifically relate to the immediacy or recency." 1 VRP (Mar. 16, 2015) at 160-61. We are not

3

scientists. While it is appropriate for judges to draw conclusions from circumstantial evidence based on ordinary experiences, I would not speculate about how DNA evidence may or may not be deposited when such information is unsupported by expert testimony.

Although I agree that the Ecko jacket is an important piece of evidence, its significance is questionable because the area in which it was found was a homeless encampment. The majority erroneously downplays this aspect of the case. The evidence regarding the existence of a homeless encampment was overwhelming. One of the two lay witnesses described the location as a place where homeless people would set up barricades and sleep. The other lay witness noted the area was a place where people would often drink, smoke cigarettes, and have parties. Of the two law enforcement officers who processed the scene, one described the area as an apparent "transient camp." 1 VRP (Mar. 16, 2015) at 134, 136. The great weight of the evidence indicated the area where Mr. Stensgar was assaulted was a homeless encampment. There was no evidence to the contrary.

A transient camp is an area where several people live communally and in poverty. It takes no expertise to know that, in such circumstances, shared bed space, food, drink, and clothing is common. Anyone who stayed at the homeless encampment would be expected to leave behind samplings of DNA and fingerprints.

The evidence presented at trial suggested Mr. Fleming had been at the encampment and had participated in some of the drinking the area was known for.

4

However, there was no evidence Mr. Fleming had been drinking from the highly relevant schnapps bottle. The evidence also showed that Mr. Fleming had at some point worn the Ecko jacket that was worn by Mr. Stensgar's assailant. But other individuals were also found to be associated with the jacket. In the collar area of the jacket, where the DNA expert originally surmised would be the best location to find DNA, there was a mixture of DNA that originated from at least three individuals.

The totality of the evidence showed nothing more than that Mr. Fleming was one of potentially numerous individuals associated with the evidence found in the encampment area. This would be a much different case if Mr. Stensgar had been assaulted in a contained area, such as a home, or a secluded location. In such circumstances, the presence of Mr. Fleming's fingerprints and DNA would be highly suggestive of guilt. But this was an open area associated with numerous unknown persons. The forensic evidence lends itself just as readily to the conclusion that Mr. Fleming was merely an occupant of the encampment as it does to the conclusion that he was the assailant. In such circumstances, where two inferences are equally probable, and yet only one points to guilt, I would find that no rational trier of fact could have found the State has met its burden beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 320, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (a mere "modicum" of evidence cannot "rationally support a conviction beyond a reasonable doubt").

No. 33644-1-III
*State v. Fleming*

An individual's mere presence in an area where a crime has occurred has been held insufficient to support an inference of criminality. *See, e.g., State v. Davis*, 16 Wn. App. 657, 659-60, 558 P.2d 263 (1977) (defendant's mere presence in a house where marijuana was being used is insufficient to show possession); *United States v. Behanna*, 814 F.2d 1318, 1320 (9th Cir. 1987) (defendant's mere presence in a vehicle is insufficient to show defendant was in possession of an unregistered firearm also found in the vehicle). The inference of criminality was also not present here. I would reverse Mr. Fleming's conviction.

_____
Pennell, J.

6