# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51698-5-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| KENNETH S. HART, | |
| Appellant. | |

GLASGOW, J. — Kenneth Hart was convicted of two counts of domestic violence second degree assault and one count of felony harassment stemming from a single incident where he strangled his wife, hit her, and threatened to kill her.

Hart appeals, arguing that the trial court erred when it held that the victim's medical records containing evidence of her bipolar diagnosis were inadmissible. He also contends that he received ineffective assistance of counsel because his attorney failed to ask him about the harassment charge during his testimony. He asserts that the trial court erred in delegating the imposition of his conditions of community custody to the Department of Corrections. Finally, Hart argues that the trial court violated his right against double jeopardy by dismissing one of his second degree assault convictions without prejudice, rather than vacating it.

We hold that the trial court did not err in excluding the medical records containing evidence of the victim's bipolar disorder because it correctly concluded that the risk of prejudice substantially outweighed their minimal probative value. Thus, Hart was not deprived of his constitutional rights to confrontation and to present a defense. We hold that Hart was not prejudiced by his counsel's failure to ask him about the harassment charge. The trial court did not err in delegating conditions of community custody to the Department because the delegation was authorized by statute. Finally, Hart's second conviction for domestic violence second degree assault should be vacated, rather than dismissed without prejudice.

We remand for correction of Hart's judgment and sentence but affirm in all other respects.

FACTS

I. BACKGROUND

At the time of the relevant incident, Hart and the victim were married and had two sons together.

On the night of October 22, 2016, the couple argued. According to the victim, Hart told her to kill herself and then started punching her in the face. Later, after she said she would never kill herself, Hart told her that he would "have to do it for [her]" and began strangling her. Verbatim Report of Proceedings (VRP) (Vol. III) at 468. He strangled her a second time about 20 minutes later, this time pushing down on her throat with his forearm. The victim testified that during both strangling incidents she experienced tunnel vision, could not breathe or talk, and believed Hart was going to kill her. Hart had taken her phone so that she could not call the police. This went on all night, until sometime in the morning when Hart went into another room, leaving his wife in the bedroom. She escaped from the house with their sons, and ran to the neighbor's house to call the police. The police arrived, interviewed the victim, photographed her injuries, and arrested Hart.

Hart was charged with two counts of domestic violence second degree assault for the two instances of strangling and one count of felony harassment for threatening to kill the victim.

## II. THE VICTIM'S MEDICAL RECORDS

Several weeks before the incident, the victim had been diagnosed with bipolar disorder and was undergoing mental health therapy and taking prescribed medications. Her medical records listed her symptoms, which included poor memory, aggression, irritability, mood swings, impulsivity, and hypersexual behavior, among others. There were also physician's notes describing increased irrational and impulsive behavior. But those symptoms improved markedly with a change in medication in early October, about three weeks before the incident described above. The records did not say that the victim could not accurately perceive, remember, and report events, other than one comment about her efforts to "piece together what happened during periods of risky behavior" before her medication was adjusted. VRP (Vol. I) at 138-39.

The State moved to exclude "any evidence of [the victim's] past or present mental health condition or medications" under ER 402 and ER 403. Clerk's Papers (CP) at 68 (emphasis omitted). Specifically, the State sought to exclude "any reference to the victim's mental health, including any supposed diagnoses, treatments, counseling sessions, or reasons for counseling." CP at 68.

The court granted the State's motion, reasoning that there was no basis in the records or evidence presented to conclude that either her bipolar disorder or her medications had prevented her from accurately perceiving, remembering, or reporting events. The court found the diagnosis and other health information "at best" "minimally probative" and "highly prejudicial." VRP (Vol. I) at 146.

Hart moved for a continuance so that an expert could review the victim's records and testify as to whether her mental health or medications at the time may have had an impact on her perceptions of the assault. The court granted the motion to continue.

At a subsequent hearing to again address the admissibility of the records, Hart's expert stated that the victim's medical records "strongly suggest[ed]" that she was suffering from "destructive and provocative interpersonal behavior" resulting from a manic phase of her bipolar disorder during the assault. VRP (Vol. II) at 205-06. According to the expert, this "indicated an altered state of mind . . . at the time of the alleged assault." VRP (Vol. II) at 205-06. The expert opined that it "would therefore seem appropriate for the trier of fact to consider [this] in the deliberation regarding her credibility as a witness." VRP (Vol. II) at 205-06. The medical records reflect that as of October 1, 2016, about three weeks before the relevant incident, the victim was suffering from "hypo-manic symptoms," including poor memory. CP at 190-91, 194. Hart argued that given the expert opinion and the content of the medical records, if the victim testified about the alleged assaults, he should be permitted to impeach her using the records. The court confirmed with defense counsel that he was seeking only to use the medical records for impeachment.

After considering the expert's opinion, the trial court again ruled that Hart could not introduce the medical records. The court reasoned that although the records supported the bipolar diagnosis and contained a reference to poor memory upon intake, they did not adequately support the conclusion that the victim was suffering from manic symptoms at the time of the assault, nor did they establish that her perception of the assault or her ability to report it would have been affected.

The court disagreed with the expert's reading of the records as to the timing of her manic episode. Because her manic episode occurred in August and perhaps early September, with

4

consistent improvement thereafter, the court found that "the probative value of the records and the information contained . . . as a basis to question [the victim's] ability to properly perceive or remember events in October of 2016 is very, very limited." VRP (Vol. II) at 263.

The court explained that "at best, there's some potential small relevancy of that one record of memory, although there is no indication of how that would impact these particular events either." VRP (Vol. II) at 262. The court noted that the expert did not indicate that someone with bipolar disorder would be unable to properly perceive events or would have memory deficits that would prevent them from recalling events. Nor was there any indication that the prescription drugs the victim was taking would have impacted her ability to perceive events.

The trial court concluded that the records were minimally relevant but carried a high risk of prejudice because of the stigma associated with mental health issues. The prejudicial effect substantially outweighed the probative value of using the medical records as a basis for impeachment. The expert's opinion therefore did not alter the court's original ruling granting the State's motion in limine "exclud[ing] reference to the information contained in the medical records." VRP (Vol. II) at 267-68.

### III. TESTIMONY AT TRIAL

At trial, the victim testified consistent with the facts described above. The court admitted pictures of her injuries and bruising. Witnesses who saw her on the morning after the incident also testified about her injuries, including black eyes.

During his testimony, Hart denied that he caused his wife's injuries, claiming that they were instead the result of consensual rough sex and deep tissue massage. Defense counsel did not elicit testimony from Hart about the alleged threat to kill his wife that was the basis for the harassment charge. But Hart did testify to an entirely different version of events, including

testimony that he told his wife he wanted a divorce that night, and she responded that she was going to take the kids and make sure he never saw them again.

During closing argument, defense counsel acknowledged that he had "neglected" to ask Hart about the alleged threats related to the harassment charge, and argued to the jury that Hart's testimony should imply Hart's denial of that charge by virtue of his testimony describing a different version of events. VRP (Vol. V) at 898-99. Counsel explained that he had not wanted to interrupt the flow of Hart's testimony and wanted to keep the focus on the more serious charges facing him. Counsel further argued that Hart's general portrayal of the events in question, along with his denials of the other charges, sufficiently contradicted the State's version of events to serve as an implicit denial of the harassment charge.

The jury found Hart guilty on all three charges. At sentencing, the State acknowledged that the two assaults occurred during a continuing course of conduct, so one of the two assault convictions had to be vacated to avoid a double jeopardy violation. The court agreed to vacate the second count of assault, and on the judgment and sentence the court "dismiss[ed] Count 02 without prejudice . . . due to double jeopardy." CP at 166.

Upon sentencing, the court ordered Hart to "participate in the following crime-related treatment or counseling services:  as directed by [the Department of Corrections]" and to "comply with the following crime-related prohibitions: as directed by [the Department]." CP at 167-68. The court also ordered Hart to have no contact with the victim during the period of community custody.

Hart appeals, arguing that the victim's medical records should have been admissible for impeachment purposes, and their exclusion deprived him of his constitutional rights to confrontation and to present a defense. He also contends that he received ineffective assistance of

counsel, and that the trial court erred when it delegated conditions of community custody to the Department and when it dismissed his second degree assault conviction without prejudice.

ANALYSIS

I. RIGHTS TO CROSS EXAMINE AND TO PRESENT A DEFENSE

Hart argues his confrontation right and right to present a defense were violated when the trial court declined to allow him to cross examine the victim regarding her medical records. We disagree.

A.    Burden and Standard of Review

A defendant's rights to confrontation and to present a defense are not absolute: the evidence that a defendant desires to introduce "'must be of at least minimal relevance'" because a defendant has no right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)). "Evidence is relevant if it has any tendency to make the existence of any consequential fact more probable or less probable. However, relevant evidence is inadmissible if the danger of unfair prejudice, confusion of the issues, or misleading the jury substantially outweighs its probative value." *State v. Farnsworth*, 185 Wn.2d 768, 782-83, 374 P.3d 1152 (2016) (citations omitted), *review denied*, 189 Wn.2d 1028 (2017). Thus,

> [i]n order for a cross-examination limitation to violate the confrontation clause, the testimony sought by the defendant, but excluded by the trial court, must (1) be minimally relevant, (2) not be so prejudicial as to disrupt the fairness of the fact-finding process at trial, and (3) the defendant's need for relevant but prejudicial information must outweigh the State's interest in withholding that information from the finder of fact.

*State v. Arredondo*, 188 Wn.2d 244, 266, 394 P.3d 348 (2017). All three of these requirements must be met. *Id.*

7

In evaluating whether a witness can be cross examined on past mental health issues, trial courts should consider the nature of the condition, whether the witness suffered from the condition at the time of the event in question, and the temporal recency or remoteness of the condition. *Id.* at 267. These factors "provide trial courts an effective means to consider the relevancy, probative value, and prejudicial effect from the disclosure of a witness' mental health limitations." *Id.*

We review a limitation on the scope of cross examination for a manifest abuse of discretion. *Id.* at 265. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017).

B.      The Court Did Not Abuse Its Discretion

Here, the trial court prevented Hart from cross-examining the victim using her medical records, which he claims suggested that she struggled with poor memory and confusion around the time of the incident. Hart argues that this evidence was highly relevant because it would have called her credibility into question. He reasons that she was the State's primary witness and her account of the incident differed significantly from Hart's.

However, Hart was not actually prohibited from cross-examining the victim about her memory issues, but rather was prohibited from introducing evidence of her specific mental health conditions and prescribed medications through her medical records. In other words, although Hart could not impeach the victim using her medical records, he still could ask her general questions about her ability to recall events.

The trial court concluded that the records were minimally relevant but were highly prejudicial, and so properly excluded them. The trial court noted that there was "some potential small relevancy" with respect to the isolated references to the victim's memory issues in the medical records, but ultimately concluded that their probative value was "very, very limited." VRP

(Vol. II) at 262-63. The court reasoned that the symptoms related to the victim's bipolar disorder did not implicate memory or perception impairment, and the references to potential memory issues in the medical records were isolated and inconsistent. Although one reference to the victim's memory issues took place around August or early September 2016, there was "consistent improvement from there on." VRP (Vol. II) at 262-63.

The court took note of Hart's expert's report that the victim had a bipolar event at the time of the incident, but concluded that this contradicted what was in the records, and Hart's expert could not "make that evaluation independently, because he didn't evaluate her." VRP (Vol. II) at 265-66. The court also reasoned that it can be challenging for a finder of fact to interpret medical records, but the lack of a consistent concern about the victim's memory suggested that the records could not be relied on to support a conclusion about her mental state on October 22 when the incident in question occurred.

With respect to the records' potential prejudicial effect, the trial court noted that there was a high risk that the jury would misunderstand the significance and meaning of a diagnosis of bipolar disorder, particularly given the stigma often attached to mental health disorders, without the benefit of an expert witness to explain it. The court accordingly concluded that this risk of prejudice substantially outweighed the minimal probative value of the records.

We hold that the trial court did not err in excluding evidence related to mental health information in the victim's medical records. It engaged in a reasonable assessment of the evidence's relevancy and a reasonable comparison of its probative value versus its prejudicial effect. *See Arredondo*, 188 Wn.2d at 268. The court considered the factors from *Arredondo*, found that the records did not establish perception or memory problems at the time of the incident, and correctly concluded that the minimal probative value of the records was substantially

9

outweighed by the risk of prejudice. This conclusion was consistent with the court's reasoning that any evidence of memory impairment in the victim's records was isolated and inconsistent, and so was not sufficiently reliable or probative to outweigh the likely prejudice that would result from the jury learning of her bipolar disorder. The trial court's ruling was neither manifestly unreasonable nor based on untenable grounds or reasons. *See id.* at 269. Because the trial court did not abuse its discretion, we need not reach the issue of prejudice.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Hart argues that his harassment conviction must be reversed because he received ineffective assistance of counsel with respect to his defense of that charge. We disagree.

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right of a criminal defendant to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). To prevail on a claim of ineffective assistance, the defendant must show both that counsel's performance was deficient and the deficient performance prejudiced the defense. *State v. Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001). A failure to show either deficiency or prejudice defeats the claim of ineffective assistance.

To show prejudice, the defendant must establish that counsel's errors "were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. In other words, the defendant must show "'a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Even if Hart's counsel's performance was deficient, an issue we need not decide, Hart was not prejudiced. Hart argues that his counsel's failure to ask him about the alleged threats to kill the victim prejudiced him because as a result, he did not have an opportunity to address the harassment charge. Hart claims that had he denied making the threat when testifying, the denial "may" have created a reasonable doubt in the minds of some jurors. Br. of Appellant at 21.

This is not enough to show prejudice; Hart must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Grier*, 171 Wn.2d at 34. Counsel argued during closing why, despite the lack of an explicit denial from Hart, the jury should still find a reasonable doubt with respect to the harassment charge. Counsel reasoned that Hart's version of events was different from the victim's, so if the jury believed his version of events, it should also conclude he did not make the threats that were the basis of the harassment charge. Defense counsel's closing argument negated any potential prejudice.

In sum, Hart has not shown a reasonable probability that the outcome of the trial would have been different had his attorney specifically asked him about the harassment charge. Defense counsel was still able to argue his theory of the case to the jury on why it should acquit Hart of that charge without his testimony. Hart does not explain what he would have testified to or how his testimony would have done more to refute the State's evidence against him. For these reasons, we hold Hart was not prejudiced.

III. CONDITIONS OF COMMUNITY CUSTODY

Hart argues the sentencing court improperly delegated certain aspects of his sentence to the Department. We disagree.

A trial court can only impose community custody conditions authorized by statute. *State v. Kolesnik*, 146 Wn. App. 790, 806, 192 P.3d 937 (2008). If the trial court had statutory authority to impose a condition, we review the trial court's decision to impose the condition for an abuse of discretion. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). An abuse of discretion occurs when the trial court's imposition of a condition is manifestly unreasonable. *State v. Hai Minh Nguyen*, 191 Wn.2d 671, 678, 425 P.3d 847 (2018).

Although it is the role of the courts to determine guilt and impose sentences, the execution of the sentence is administrative in character and is properly exercised by an administrative body, consistent with the manner prescribed by the legislature. *State v. Sansone*, 127 Wn. App. 630, 642, 111 P.3d 1251 (2005). A sentencing court "may not delegate excessively" or abdicate its judicial responsibility for setting the conditions of release. *Id.*

Under RCW 9.94A.703,[1] courts "shall impose" certain conditions of community custody, including a requirement that the offender "'comply with *any* conditions imposed by the [D]epartment under RCW 9.94A.704.'" *State v. Petterson*, 190 Wn.2d 92, 100, 409 P.3d 187 (2018) (interpreting this language as mandatory so long as the person is under community custody) (quoting RCW 9.94A.703(1)(b)) (emphasis added). Under RCW 9.94A.704, the Department must determine conditions on the basis of risk to the community safety. RCW 9.94A.704(2)(a). "The [D]epartment may require the offender to participate in rehabilitative programs, or otherwise

---

[1] The legislature amended RCW 9.94A.703 in 2018. Because the relevant language has not changed, we cite to the current version of this statute.

perform affirmative conduct." RCW 9.94A.704(4). And the offender has a right to administrative review to ensure that Department-imposed conditions are "reasonably related to the crime of conviction, the offender's risk of reoffending, or the safety of the community." RCW 9.94A.704(7)(b). Thus, there is a mechanism to challenge a Department-imposed condition of community custody if an offender believes the condition is not sufficiently crime related.

Here, the court imposed conditions requiring Hart to participate in crime related treatment or counseling services "as directed by [the Department]" and to "comply with the following crime-related prohibitions: as directed by [the Department]." CP at 167-68. This type of delegation is consistent with RCW 9.94A.703 and RCW 9.94A.704, and any requirements that the Department imposes are subject to administrative review. The trial court did not abuse its discretion when it imposed these conditions and we accordingly reject Hart's argument.

## IV. DOUBLE JEOPARDY

Hart argues the trial court violated his rights against double jeopardy by dismissing one of his second degree assault convictions without prejudice, rather than vacating it. We agree that this count should be vacated.

The remedy for a double jeopardy violation is to vacate one of the underlying convictions. *State v. Womac*, 160 Wn.2d 643, 660, 160 P.3d 40 (2007). A court violates double jeopardy if it vacates an offending conviction "while directing, in some form or another, that the conviction nonetheless remains valid." *State v. Turner*, 169 Wn.2d 448, 464, 238 P.3d 461 (2010). This is true "even when the lesser convictions are not actually reduced to judgment and do not appear on the defendants' criminal records." *Id.* at 465. "To assure that double jeopardy proscriptions are carefully observed, a judgment and sentence must not include *any* reference to the vacated conviction." *Id.* at 464 (emphasis added).

13

The jury found Hart guilty of both counts of second degree assault (counts 1 and 2). The trial court dismissed count 2 without prejudice due to double jeopardy, and did not include it among Hart's convictions. However, the court did reference count 2 on the judgment and sentence by noting that it had dismissed it without prejudice. Hart argues that the court's use of the term "'without prejudice'" suggests that his conviction on that count can still be reinstated. Br. of Appellant at 24 (quoting CP at 166).

Because the proper formal remedy for a double jeopardy violation is to vacate the less serious conviction without any mention of the vacated conviction in the judgment and sentence, we remand for correction of Hart's judgment and sentence. Count 2 should be vacated, rather than dismissed without prejudice, and no reference to it should appear in Hart's judgment and sentence.

CONCLUSION

We remand for correction of Hart's judgment and sentence but affirm in all other respects.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Maxa, C.J.

Melnick, J.