IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81930-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DAVID RANDALL WRIGHT, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — David Wright appeals his conviction for first degree murder after a jury found that he shot and killed Raul Cuadros during an attempted robbery. Wright contends that the court erred by refusing his proposed good faith claim of title instruction. He also argues that he is entitled to resentencing because his offender score improperly included a point for a prior drug possession conviction, now invalid under State v. Blake,[1] and a point for committing the murder while on community custody for the drug possession conviction. We affirm Wright's conviction but remand for resentencing.

FACTS

On February 15, 2019, Brianna Reynolds hatched a plan with Raul Cuadros and Oliver Rosales (aka "Grumpy") to rob her drug dealer, Kodi Anderson.[2] She

---

[1] 197 Wn.2d 170, 481 P.3d 521 (2021).
[2] For clarity, we refer to the participants by their first names.

Citations and pin cites are based on the Westlaw online version of the cited material.

arranged to meet Kodi at an Everett Motel 6 under the pretense of buying drugs from him. When Kodi arrived, Grumpy and Raul were hiding in the bathroom. As Kodi began weighing out the drugs, Raul and Grumpy came out of the bathroom and demanded that he hand over his "stuff." According to Kodi, one of the men was armed with a firearm and used it to pistol-whip him. Brianna, Raul, and Grumpy fled the motel room with Kodi's methamphetamine, heroin, and backpack containing a Galaxy Note10 tablet, a small speaker, a couple of journals, a drug pouch, and 60 dollars. After being robbed, Kodi and his friend, Raymond Tannehill, drove around looking for the perpetrators but could not find them.

Kodi told his friend, Christopher Phelps, about the robbery and Brianna's involvement in it. On February 17, 2019, Christopher notified Kodi that Brianna had contacted him asking to buy drugs and that she was waiting for him outside a Jack in the Box restaurant. Brianna testified she and Raul planned to rob Christopher when he arrived in retribution for him having robbed her in the past. When Kodi learned of Brianna's whereabouts, he wanted to confront her to "get back [his] stuff and wanted to get back at her." Kodi asked Christopher if he had a gun; Christopher said no and refused to go with him to the Jack in the Box. He told Kodi to call David Wright to go with him. Phone records confirmed Kodi's contact with Wright that night.

Wright testified that he went along "to make sure that nobody harmed Kodi." Wright was aware Kodi had been robbed and wanted "to get his stuff back," and that the robbers had displayed firearms during the robbery. So, despite having prior felony convictions making it illegal for him to possess firearms, Wright armed

- 2 -

himself with a semiautomatic M&P Shield 9 mm pistol. He did so because he knew there was risk of violence.

Kodi and Raymond picked up Wright, and the three drove to the Jack in the Box. While en route, they discussed that they "were going to rob Bri for what she had." The plan, according to Kodi, was "just . . . to beat them up and take their shit."

Kodi and Wright, both wearing bandanas covering the lower half of their faces, walked into the restaurant parking lot and saw Brianna standing with Raul. Kodi approached Brianna and demanded that she "[g]ive me your stuff. Come on, just give it to me. Make it easy on yourself." He testified, "I attempted to rob her." Brianna refused, telling Kodi that he could have her stuff "when he pries it out of my cold dead hands." Both she and Raul tried to walk away. Kodi, angry, followed and grabbed at Brianna's purse. Brianna saw Wright pull a gun from his waistband. She turned to Kodi and sprayed him with pepper spray. Kodi ducked to avoid the spray, heard a gunshot, and took off running. Wright followed.

Brianna saw Raul on the ground and ran to his side to provide first aid. She discovered a gunshot wound in his chest and a revolver tucked into his pants waistband. She removed the revolver and hid it in her purse. Raul died of a gunshot wound to his chest shortly thereafter.

After fleeing the parking lot, Kodi saw Wright bury his pistol behind an electrical box while they waited for Raymond to pick them up. Raymond dropped them off at Christopher's house; he swapped the clothing they had worn during the shooting with clean clothing.

During the ensuing investigation, the police interviewed Brianna and learned of Kodi's identity. They also discovered Raul's revolver in her purse. Police recovered Kodi's backpack and journals in the home of Brianna's friend, Jackie Yegge. Surveillance footage, phone records, and an interview with Kodi, led them to Raymond, Christopher and, ultimately, Wright.

The State charged Wright with one count of first degree murder, one count of second degree murder, and two counts of unlawful possession of a firearm. Kodi, initially charged with Raul's murder as an accomplice, entered into a plea agreement with the State in which he pleaded guilty to attempted first degree robbery and testified against Wright at trial. He testified that he intended to take whatever property Brianna had that was of value and would have shared whatever he took with Wright. Brianna, under a grant of immunity from prosecution for the crimes of tampering with evidence for removing the revolver, the robbery of Kodi and the attempted robbery of Christopher, also testified at trial. Both Kodi and Brianna testified that Raul made no threats or threatening gestures toward Kodi or Wright before Wright shot him. The revolver Brianna found tucked in Raul's waistband was unloaded and had visible cobwebs in the barrel when police recovered it from Brianna.

Before the State rested its case, Wright stipulated that he was present with Kodi on February 17, 2019, and that he shot Raul. Wright took the stand and again admitted that he shot Raul but claimed he did so because Raul had pulled the firearm from his waistband and pointed it at Wright. Wright disputed Kodi's version of events, testifying that Kodi had never told him of any plan to rob Brianna. Wright

claimed that, as far as he knew, he was there only to make sure Kodi was not hurt while trying to get his property back. He confirmed that he intentionally shot Raul, knowing that he could kill him.

The jury found Wright guilty of murder in the first degree.[3] It also found that he was armed with a firearm in the commission of that crime. Wright pleaded guilty to the two counts of unlawful possession of a firearm.

At sentencing, the trial court found that Wright's offender score for the murder conviction was 12 and his offender score for the two firearm possession convictions was 11. The standard range for the murder, for a score of "9+," was 411 to 548 months, with an additional 60 months for the firearm enhancement. The standard range for unlawful firearm possession, for a score of "9+," was 87 to 116 months. The court sentenced Wright to midrange sentences of 486 months on the murder conviction and 100 months on the two firearm possession convictions.

Wright appeals the murder conviction and his sentence.

## ANALYSIS

### 1. Jury Instruction

Wright first contends the trial court violated his due process rights by refusing to instruct the jury that the State had to disprove his defense of a good faith claim of title. We disagree.

Instruction No. 2 informed the jury that

> [t]he defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the

---

[3] The jury also found Wright guilty of the alternative charge of murder in the second degree. The court vacated that conviction on double jeopardy grounds at the State's request.

plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.

In Instruction No. 9, the "to convict" instruction for first degree murder, the trial court instructed the jury that the State had the burden to prove beyond a reasonable doubt that "on or about February 17, 2019, the defendant and/or an accomplice attempted to commit robbery; . . . [and] the defendant and/or an accomplice caused the death of Raul Cuadros in the course of or in furtherance of that attempted robbery or in immediate flight from that attempted robbery." The instruction also contained the standard burden of proof verbiage: "[i]f you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty."

Wright's theory at trial was Kodi had not intended to commit theft or robbery when he confronted Brianna but was instead merely attempting to recover his own property. He argued that if Kodi's intent was to recover property that rightfully belonged to him, he was not committing robbery and Wright could not be an accomplice to an attempted robbery. The shooting, he maintained, did not occur in the course of an attempted robbery and instead was an act of self-defense.

Wright requested a good faith claim of title jury instruction based on WPIC 19.08:[4]

> It is a defense to a charge of theft that the property or service was appropriated or attempted to be appropriated openly and avowedly under a good faith claim of title, even if the claim is untenable.

---

[4] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 19.08, at 356 (5th ed. 2021) (WPIC)

The State has the burden of proving beyond a reasonable doubt that the defendant did not attempt to appropriate the property openly and avowedly under a good faith claim of title. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to the charge of First Degree Murder in Count One.

The trial court modified this proposed instruction in Instruction No. 16:

It is a defense to an allegation of theft that the specific property involved was appropriated, or attempted to be appropriated, openly and avowedly under a good faith claim of title, even if the claim is untenable.

It is not a defense to an allegation of theft that the defendant or an accomplice attempted to take different property that was of a similar or equivalent value to the property to which the good faith claim of ownership applied.

The court explained that the last sentence of Wright's proposed instruction was unnecessary because it was duplicative of language in both the "to convict" instruction, Instruction No. 16, and the burden of proof instruction, Instruction No. 2.

Wright argues that by giving a good faith claim of title instruction without a statement that the State had the burden to disprove the defense, the trial court impermissibly placed the burden of proof on him, violating his due process rights. The Fourteenth Amendment's due process clause requires the State to prove beyond a reasonable doubt all facts necessary to prove the charged crime. U.S. Const. XIV. A defendant's challenge to the adequacy of specific jury instructions informing the jury of the State's burden of proof requires the court to review the challenged instructions de novo in the context of the instructions as a whole. State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).

Both parties agree that it is a defense to a charge of theft or robbery that property was "appropriated openly and avowedly under a claim of title made in good faith, even though the claim be untenable." RCW 9A.56.020(2)(a). The parties also agree that "[a] person cannot be guilty of robbery in forcibly taking property from another if he does so under the good faith belief that he is the owner, or entitled to possession of the property." State v. Hicks, 102 Wn.2d 182, 184, 683 P.2d 186 (1984). "Although [Washington's] robbery statute, RCW 9A.56.190, does not include an intent element, [the] settled case law is clear that 'intent to steal' is an essential element of the crime of robbery." State v. Kjorsvik, 117 Wn.2d 93, 98, 812 P.2d 86 (1991). The difference between robbery and theft is the use or threatened use of force; robbery involves the use of force while theft does not. State v. Farnsworth, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). Good faith claim of title negates the element of intent to steal for both crimes. Hicks, 102 Wn.2d at 187. Because the element of the defense negates an element of the offense, the State must prove the absence of the defense beyond a reasonable doubt. Id. at 187.

Our Supreme Court has recognized that when the State bears the burden of disproving a defense, a specific instruction to this effect is preferable, "but failure to provide one is not reversible per se so long as the instructions, taken as a whole, make it clear that the State has the burden." State v. Acosta, 101 Wn.2d 612, 621, 683 P.2d 1069 (1984) (reversing conviction because "to convict" instruction did not tell jury that force used must be unlawful or without justification when self-defense raised). In State v. Imokawa, 194 Wn.2d 391, 397, 450 P.3d 159 (2019), the

- 8 -

Supreme Court stated that, in general, a jury instruction explicitly providing that the State must prove beyond a reasonable doubt that the statutory elements of the crime is sufficient when the defense at issue negates an element listed in the to-convict instruction.

In this case, the intent to "unlawfully" take property from Brianna was an element of Wright's "to convict" instruction for first degree murder. Instruction No. 16 instructed the jury that the State had to prove Wright or an accomplice "attempted to commit robbery." Instruction No. 13 provided that "[a]n individual commits a robbery when he or she <u>unlawfully</u> and <u>with intent to commit theft</u> thereof, takes personal property from another person . . . , and the taking was against that person's will" (emphasis added). Instruction No. 12 stated that "[a]n individual attempts to commit robbery when, <u>with the intent to commit that crime</u>, he or she does any act that is a substantial step toward the commission of that crime" (emphasis added). When these three instructions are read together, it is clear that the State bore the burden of proving, beyond a reasonable doubt, that Wright or Kodi intended to unlawfully (i.e., without a good faith claim of title) take personal property from Brianna.

Wright relies on <u>State v. Acosta</u> to challenge the adequacy of the jury instructions here. That case, however, is distinguishable. In <u>Acosta</u>, the defendant was charged with second degree assault. 101 Wn.2d at 614. He claimed to have acted in self-defense. <u>Id.</u> Acosta proposed, and the trial court refused, an instruction explicitly stating the State had to prove beyond a reasonable doubt that Acosta "was not acting in self-defense, or using lawful force as defined elsewhere

in these instructions." Id. Our Supreme Court held that even when reading the instructions as a whole, they failed to adequately inform the jury that the State must prove the absence of self-defense because "the jury was not told in the 'to convict' instruction that the force used must be unlawful, wrongful, or without justification or excuse." Id. at 623.

But here, unlike Acosta, the instructions were clear that the State had to prove that Wright or Kodi acted "unlawfully" in their attempt to take property from Brianna. That element clearly negated any contention that Kodi acted lawfully, under a good faith belief that he owned the property he was attempting to take from her.

This case is more analogous to Imokawa, in which the State charged Imokawa with vehicular homicide, vehicular assault, and reckless driving after Imokawa caused a car accident, injuring one person and killing another. 194 Wn.2d at 393. At trial, the court refused Imokawa's proposed instruction that the State had the burden to prove the absence of a superseding intervening cause. Id. at 395.

On appeal, the Washington Supreme Court rejected Imokawa's argument that the instructions violated his due process rights. Id. at 403. The court decided that a separate burden of proof instruction was unnecessary because proximate cause and superseding intervening cause are mutually exclusive concepts, and the trial court gave standard instructions defining proximate cause and reasonable doubt, and informing the jury that the defendant was presumed innocent, that the burden was on the State to prove every element of the crimes beyond a reasonable

doubt, and that the defendant had no burden to prove reasonable doubt. Id. This combination of instructions, it concluded, properly stated the law, did not shift the burden of proof to the defendant, did not mislead, and allowed the defendant to present his theory of the case. Id. at 402-03.

As in Imokawa, the intent to unlawfully take personal property of another and the intent to, in good faith, recover one's own property, are mutually exclusive. And as in Imokawa, the trial court defined reasonable doubt, informed the jury that Wright was presumed innocent, made it clear that the State had to prove every element of every crime beyond a reasonable doubt, and indicated that Wright had no burden to prove reasonable doubt. See also State v. Knapp, 197 Wn.2d 579, 592, 486 P.3d 113 (2021) ("[w]hat matters is not whether one jury instruction provides a definition, but whether the instructions as a whole properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue his theory of the case." (internal quotations omitted)).

Because the jury instructions properly informed the jury as to the law and did not mislead the jury, the trial court did not violate Wright's due process rights in rejecting his proposed instruction.

### 2. Offender Score

Wright next contends that he is entitled to resentencing because his offender score included a point for an invalid drug possession conviction under State v. Blake, and included a point for committing these crimes while on

community custody for the Blake conviction.[5]  He contends both points should be eliminated from his offender score.

The court reviews a sentencing court's offender score calculation de novo. State v. Griepsma, 17 Wn. App. 2d 606, 619, 490 P.3d 239 (2021).

The offender score cannot include a prior conviction based on a constitutionally invalid statute. State v. Markovich, 19 Wn. App. 2d 157, 173, 492 P.3d 206 (2021).  "'[A] sentence that is based upon an incorrect offender score is a fundamental defect that inherently results in a miscarriage of justice.'"  Id. (quoting In re Pers. Restraint of Goodwin, 146 Wn.2d 861, 868, 50 P.3d 618 (2002)).  The adequate remedy for this type of defect is resentencing in accordance with the correct offender score.  Id.

The State does not dispute that Wright's offender score was miscalculated under Blake.  It argues instead that, even if the court erred in including the Blake point in his offender score, the standard range would not change because his offender score remains a 9 or higher.  It argues that under In re Pers. Restraint of Toledo-Sotelo, 176 Wn.2d 759, 297 P.3d 51 (2013), Wright need not be resentenced because a reduced offender score would not change the applicable SRA standard range.  But the issue in Toledo-Sotelo was whether the error in Toledo-Sotelo's offender score rendered the judgment and sentence "facially invalid," as required for his personal restraint petition to be timely under RCW 10.73.090(1).  Toledo-Sotelo at 768-79.  It held that even if the offender score had

---

[5] Wright sought and received permission from this court to raise in his reply brief a supplemental assignment of error relating to the point associated with his community custody status for the 2016 possession conviction.

been incorrectly calculated, the trial court would have sentenced him within the same range, the sentence was not facially invalid, and the petition was not untimely. Id. 768-69.

We are asked to review Wright's offender score on direct appeal, not in an arguably untimely personal restraint petition. The more appropriate precedent is Griepsma. In that case, the sentencing court imposed a midrange sentence of 55 months for assault convictions based upon a finding that Griepsma's offender score was "9+." Griepsma, 17 Wn. App. 2d at 611. Griepsma contended on appeal that the State had failed to prove a prior burglary conviction resulting in an incorrect offender score. Id. at 620. This court agreed. Id. at 619. It could not conclude that including the prior burglary conviction in his criminal history was harmless error. Id. at 621. It held that an offender score error is not harmless, even if the sentencing range is the same, if the record does not clearly indicate that the sentencing court would have imposed the same sentence without the erroneous offender score. Id. Because the court could not discern from the record in that case that the court would have imposed the same sentence given the correct offender score, it remanded for resentencing. Id.

We similarly cannot conclude the error in calculating Wright's offender score was harmless. The State sought a high end sentence of 530 months on the murder conviction. Wright sought an exceptional sentence of 180 months. The trial court considered both requests and factored into its sentencing decision Wright's statements of remorse, the apparent lack of any premeditation, and Wright's extensive criminal history. As to the latter issue, it noted

- 13 -

Another factor to consider here is that the defendant has substantial criminal history. That substantial criminal history is already calculated into the standard range, but it is still noteworthy that he has a high offender score. He is in a 9-plus category that appears to be a 12. And whether it's precisely 12 or not, it is still above, really, the 9 which would otherwise trigger the maximum standard range.

In any event, I have considered all possible options including, for example, the possibility of an exceptional sentence downward. But ultimately the Court concludes that a sentence below the standard range or even at the low end is not appropriate. But I do at least agree that the sentence should be significantly below what the State recommends. The bottom line is that the Court will order a term of confinement of 486 months. 486 months or essentially 40.5 years.

This record indicates that the trial court, in selecting the appropriate sentence, assumed Wright's criminal history was more substantial than it actually was. We therefore cannot say that the court would have imposed the same sentence if it had the correct score and criminal history before it. Because the "'record does not clearly indicate that the sentencing court would have imposed the same sentence,'" Griepsma, 17 Wn. App. 2d at 621 (quoting State v. McCorkle, 88 Wn. App. 485, 499-500, 945 P.2d 736 (1997), resentencing is necessary.

The State also challenges Wright's argument that the community custody point should be excluded from the offender score. It contends the record is unclear as to whether Wright was on community custody for a prior, valid identity theft conviction or the invalid drug possession conviction.

In the amended information, the State alleged that each of the charged crimes "was committed while the defendant was under community custody, as

provided by RCW 9.94A.525(19)."[6]  At trial, the parties stipulated that Wright's community custody status would be decided by the court at the time of sentencing and did not need to be presented to the jury.

The State's sentencing memorandum indicated that Wright was convicted of second degree identity theft in August 2013 and sentenced to 12 months of community custody for that crime.  It also represented that Wright was convicted of drug possession in 2016 and sentenced to 12 months of community custody for that conviction.  The State asked the court to find that Wright was on community custody at the time of the offenses, but did not indicate if this status related to the 2013 identity theft conviction, the 2016 possession conviction, or both.  Wright stipulated to the accuracy of the criminal history set out in the State's sentencing memorandum, but did not indicate the crime for which Wright was on community custody.

While it seems unlikely that in February 2019 Wright would have been on community custody for a 2013 conviction, it is certainly possible, and we cannot make this determination on the record before us.  Given that we remand for resentencing to eliminate the Blake point from Wright's offender score, we defer to the trial court to determine in the first instance whether Wright's community custody point related to the invalid Blake conviction or the valid identity theft conviction.[7]

---

[6] RCW 9.94A.525(19) provides in pertinent part "[i]f the present conviction is for an offense committed while the offender was under community custody, add one point."

[7] The State also contends that even if the community custody point resulted from an invalid conviction under Blake, the point should not be excluded from Wright's offender score. It argues that the judgment and sentence placing Wright on community custody was a valid order at the time he committed the 2019 offenses and the subsequent invalidation of the underlying conviction does not change the fact that he committed the current offenses while under community custody. But we need not reach this issue unless Wright's community custody status related to drug possession conviction. The State is free to advance this argument before the sentencing court on remand.

### 3. Statement of Additional Grounds

Wright raises several additional issues in a statement of additional grounds (SAG): (1) the trial court erred by refusing to dismiss the prosecution for discovery violations, (2) the trial continuances violated his right to a speedy trial, (3) the inability to access a barber violated his right to a fair trial, (4) he lacked access to discovery, (5) technical issues with the court's computer monitors violated his right to a fair trial, (6) the mask and social distancing requirements violated his right to a fair trial, and (7) he received ineffective assistance of counsel. We disagree with all of them.

#### (1)  Alleged discovery violations

In SAG #1, Wright asserts that the trial court erred by not dismissing the case based on the prosecutor accessing the contents of a jail phone call between Wright and his attorney.  We cannot find support for this accusation in the record. Defense counsel did move orally to dismiss the case based on the allegation that Kodi's attorney had seen, in the State's discovery materials, a recording of a conversation between Wright and his counsel.  But defense counsel also informed the court he had yet to review that discovery.  The court reserved ruling on any such motion until counsel could investigate and, if necessary, develop the record fully.  Defense counsel did not raise the issue again.

Wright failed to preserve this issue for appeal by failing to renew his motion to dismiss.  When a court reserves a ruling on a motion, the moving party must "again raise the issue at an appropriate time to insure that a record of the ruling is made for appellate purposes." State v. Noltie, 116 Wn.2d 831, 844, 809 P.2d 190

(1991). Because Wright did not do so, he waived this claim of error.

(2)     Alleged speedy trial violation

In SAG #2, Wright alleges his trial counsel erroneously told the trial court that one of the trial continuances was an "agreed continuance" because Wright did not agree to it. But the record shows that three continuances were granted over Wright's objection. The record does not support his allegation that his trial counsel misrepresented his wishes to the court.

(3)     Lack of access to a barber

In SAG #3, Wright asserts that he was denied a fair trial because the prison's COVID-19 protocols did not allow him access to a barber. We recognize that a criminal defendant has the right to appear before a jury "with the appearance, dignity, and self-respect of a free and innocent man." State v. Finch, 137 Wn.2d 792, 844, 975 P.2d 967 (1999) (plurality opinion).

Here, Wright concedes the prison allowed him to have a shaving razor. Wright contends, however, that he was forced to choose between an "unbarbered . . . look" and a clean shave. Wright says he chose to attend court with the unbarbered and unclean look" which may have biased the jury against him. Wright did not raise this issue below. When a party fails to raise an issue at trial, that party waives the issue on appeal. State v. Robinson, 171 Wn.2d 292, 304, 253 P.3d 84 (2011). The party can raise the issue on appeal only if the party can show the presence of a "manifest error affecting a constitutional right." State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Wright cites no authority for the proposition that it is unconstitutionally unfair

to require a defendant to appear at trial with an "unbarbered look". While a defendant has the right to appear free from restraints to ensure the presumption of innocence, there is no case law suggesting that this right includes the right to the services of a barber or facial grooming of one's choice. In general, a defendant's haircut alone does not constitute an impermissibly distinctive reminder of a person's incarcerated status or prejudicially mark the defendant as a prisoner. People v. Payne, 285 Mich. App. 181, 186, 774 N.W.2d 714 (2009). We reject the argument that the inability to groom himself for trial somehow prejudiced his right to a fair trial.

(4)     Lack of access to discovery

In SAG #4, Wright claims he lacked access to discovery after defense counsel fired their investigator because the investigator often went over discovery with Wright. The record contains no information regarding this issue; neither Wright nor counsel raised this issue before the court. When a claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record. McFarland, 127 Wn.2d at 335. If a defendant wishes to raise a claim of deficient representation that requires facts not in the existing record, the appropriate means to do so is through a personal restraint petition. McFarland, 127 Wn.2d at 335. We will not consider this allegation on direct appeal.

(5)     Technical issues with jurors' monitors

In SAG #5, Wright argues the jury may have missed important information during the trial because the jurors' monitors would occasionally shut off. To accomplish social distancing, the court asked the jury to sit in the court gallery

rather than in the jury box. To provide the jury with a close view of the witnesses as they testified, the court placed monitor screens on both sides of the gallery. During trial, one of these monitors occasionally shut off. When the monitor went into sleep mode, members of the jury or the prosecutor brought the issue to the court's attention and the court had staff fix the monitor.

Wright did not raise this issue during trial and waives the issue on appeal. Robinson, 171 Wn.2d at 304. Wright does not explain how intermittent technical issues with a monitor, placed in the gallery to give jurors a close-up view of witnesses as they testified, affected his right to a fair trial or any other constitutional right. Since Wright did not raise this issue at trial and Wright does not show how the technical issue amounted to a manifest error affecting a constitutional right, we refuse to address it.

(6)    COVID-19 mask and social distancing requirements

In Sag #6, Wright argues the trial court's COVID-19 requirements could have distracted the jury, leading to an unfair trial. From the record, we glean that the court's COVID-19 protocols required the jury to wear masks during the trial and to social distance, which the court accomplished by placing the jurors in the court gallery and having spectators seated in the jury box. Wright did not object to any of these COVID-19 protocols.

Wright contends that the jury could have become frustrated by the masks during trial and this could have affected their verdict. Not only did Wright fail to object to the masks on this basis during trial but he is merely speculating on how masks or social distancing may have affected the jury's ability to be impartial.

While RAP 10.10(c) does not require a defendant to refer to the record or cite to authority in a SAG, "the appellate court will not consider [an appellant's] statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." Wright's allegation does not inform this court of the "nature and occurrence of alleged errors," making his claim too speculative for us to address.

(7)     Ineffective assistance of counsel

In SAG #7, Wright argues that his trial counsel was ineffective because counsel could not recall the names of people involved in his case, suggesting a lack of familiarity with the facts, the witnesses, or the case. The reviewing court will decline to consider a SAG argument due to lack of evidentiary basis when the record does not contain the necessary support for an argument. RAP 10.10(c); See also State v. Bluehorse, 159 Wn. App. 410, 435, 248 P.3d 537 (2011) (holding Bluehorse's SAG claim regarding the public trial right fails because the cited portions of the record do not support his contention). We can find no evidentiary support in the record for this argument and decline to reach it.

We affirm Wright's conviction but remand for resentencing.

_Andrus, A.C.J._

WE CONCUR:

_Smith, J._                     _Appelwick, J._